**John M.J. MADEY, Plaintiff,**

**v.**

**DUKE UNIVERSITY, Defendant.**

**No. 1:97 CV 01170.**

United States District Court,
M.D. North Carolina.

June 15, 2001.

Randall M. Roden, Tharrington Smith, Raleigh, NC, James Lee Lester, Rhodes & Mason, P.L.L.C., Greensboro, NC, for plaintiff.

John M. Simpson, Fulbright & Jaworski, L.L.P., Washington, DC, for defendant.

*MEMORANDUM OPINION*

BEATY, District Judge.

This matter is presently before the Court on Defendant Duke University's motions for partial summary judgment. Specifically, Defendant has submitted the following motions for consideration in response to Plaintiff's claims: (1) a Motion for Partial Summary Judgment of Non–Infringement of the '103 and '994 Patents Based on Government License ("Patent Motion") [Document # 65]; (2) a Motion for Partial Summary Judgment of Non–Infringement with Respect to the NCCU Test Stand Gun ("Test Stand Gun Motion") [Document # 60]; and (3) a Motion for Partial Summary Judgment on the State Law Claims ("State Law Motion") [Document # 63]. For the reasons that follow, Defendant's Patent Motion and Defendant's Test Stand Gun Motion are GRANTED. In view of the Court's decision with respect to these motions, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, Defendant's State Law Motion is not addressed by this Memorandum Opinion.

## I. FACTS AND PROCEDURAL BACKGROUND

Plaintiff John M.J. Madey ("Plaintiff" or "Dr. Madey") is an internationally known scientist and scholar in the field of electromagnetic radiation and its uses. Dr. Madey was hired by Defendant Duke University ("Defendant", "Duke", "the University") in 1989 as a professor, primarily to assist the University in establishing a Free Electron Laser Laboratory ("FEL Lab") and research program. Before coming to Duke, Plaintiff secured United States Patent Number 4,641,103 for the microwave electron guns now used in the FEL Lab ("103 Patent"). Plaintiff is also the co-owner and exclusive patent holder for United States Patent Number 5,130,994 ("994 Patent"), the patent that covers the Mark III, a Free Electron Laser that is also currently in use in the FEL Lab.

In light of Plaintiff's then-recent developments, Plaintiff thought it necessary, based on his prior experiences with Stanford University, to obtain certain assurances from Duke covering his work and the equipment that would be used in furtherance thereof.[1] Accordingly, Plaintiff and Defendant allegedly entered into a Research Agreement that detailed the terms upon which Plaintiff would transfer to the University. According to Plaintiff's First Amended and Supplemental Complaint, the Research Agreement provided for the following arrangements: that Plaintiff would become a tenured faculty member of the Department of Physics, as outlined in the Duke University Faculty Handbook, that Plaintiff would locate his research and patented equipment in the FEL Lab constructed by Duke, that Plaintiff would assist the University in obtain-

---

1. Prior to coming to Duke University, Plaintiff was a professor and researcher at Stanford University.

ing research grants and serve as Principal Investigator of said grants, that Plaintiff would be the Director of the FEL Lab, and that Plaintiff would be permitted to pursue research of interest to him using the laboratory's equipment and facilities. (Pl.'s First Am. & Supplemental Compl. ¶ 14.)

At some point following Plaintiff's arrival at Duke, Defendant and North Carolina Central University ("NCCU") entered into a subcontract with respect to what has been termed by Defendant as "the NCCU test stand gun" ("test gun"). Under the subcontract, Defendant was to assist NCCU in performing its research of the test gun, a gun that was closely "patterned on the microwave gun of the highly successful MKIII FEL." (Ex. A, Attach. 4; Ex. A, App. A, p. 2.) The test gun was assembled and constructed pursuant to the AFOSR–0062K Contract ("AFOSR Contract"), a contract that was awarded to NCCU by the Government. (Def.'s Ex. A, Attach. 1.) The AFOSR Contract's stated purpose was to "[d]evelop and study a microwave driven electron gun suitable for experiments to generate high frequency electromagnetic radiation." (Id. at 2.) The AFOSR Contract listed NCCU as the Contractor, listed Dr. Charles Ronald Jones, an NCCU professor, as the Principal Investigator, and listed the test gun as an asset of NCCU. (Def.'s Ex. A, Attach. 3, p. 193.) The AFOSR Contract also provided for reimbursement for the work performed under the subcontract between Defendant and NCCU, so long as the costs of the subcontract did not exceed $45,117. (Ex. A, Attach.1, p. 8.)

As to the respective responsibilities under the subcontract, Dr. Jones served as Principal Investigator and Dr. Stephen Benson, a professor at Duke, served as Senior Investigator. Pursuant to the subcontract, the test gun would be assembled and installed in the Physics Building on Defendant's campus to take advantage of the sophisticated fabrication techniques available through Defendant's shop facilities. (Ex. A ¶ 7.) The Physics Building at Duke was also considered to be an ideal location for the construction of the test gun because Defendant had an already established Radiation Safety Committee. (See id.)

Following the construction of the test gun, NCCU was awarded Grant No. DAAH04–93–G–0230 from the Army Research Office. (Ex. A, Attach.5, p. 1.) This grant was entitled "Commissioning and Characterization of a Microwave Electron Gun." (Id.) In connection with the grant, Defendant submitted a research proposal to NCCU, proposing to "participate in the commissioning and characterization of the NCCU electron gun." (Id. at App. A, pp. 1–2.) Plaintiff endorsed the proposal submitted by Defendant, named himself as Principal Investigator, and signed the proposal on behalf of Defendant. (Id. at 1). NCCU accepted this proposal, and, on or about February 23, 1994, NCCU and Defendant entered into a second subcontract based upon the proposal. (Ex. A, Attach.7.) As to the responsibilities under the second contract, Dr. Jones served as Principal Investigator and Plaintiff served as the Senior Investigator.

■ Also with Plaintiff's assistance, the University received a federal research grant from the Office of Naval Research (the "ONR grant"). (Pl.'s First Am. & Supplemental Compl. ¶ 21.) Under the terms of the ONR grant, Plaintiff was to be the Principal Investigator for the research conducted by the University. (Id. at ¶ 22.) The agreement further provided that Plaintiff would have the authority to direct the research and expenditure of grant funds in accordance with the terms and conditions of the grant proposal. (See

*id.*) Despite the terms set forth in the proposal, Plaintiff claims that Duke University revised the plans for construction of the FEL Lab in order to accommodate the research interests of other professors in the field of nuclear physics. (*Id.* at ¶ 32.) Plaintiff objected to the changed plans on scientific grounds and because he considered the changed plans to be an improper diversion of federal research funds. (*Id.* at ¶ 40.) According to Plaintiff, as a result of his objections, Defendant conspired to take control of the FEL Lab and his patented technology. (*Id.* at ¶ 42.) Plaintiff further claims that when he objected to the changed plans, members of the University faculty conceived of a plan to remove Plaintiff from his position of authority by engaging in the following courses of action. First, a second Director was appointed to run the FEL Lab along with Plaintiff, thereby creating a situation wherein Plaintiff's objections to changes within the Lab could be neutralized by the second Director. (*Id.* at ¶ 43). Second, Defendant created an advisory committee, composed of senior administrators committed to the changed plans advocated by Defendant. (*Id.* at ¶ 44.) This committee had the power to veto decisions made by Plaintiff. (*Id.*). Finally, Plaintiff alleges that after he objected to these changes in the management of the Lab, Defendant removed him from his position as Director of the Lab and petitioned the Office of Naval Research to remove Plaintiff from his position as Principal Investigator on the ONR grant. (*Id.* at ¶¶ 52–56.) Since his removal, Plaintiff claims that Defendant's officials have asserted control and authority over all aspects of the research project, including the hiring and firing of personnel, the procurement of equipment and supplies, and other decisions that were within the responsibility of the Principal Investigator. (*Id.* at ¶ 54.) Shortly upon being removed from his position, and because Plaintiff objected to the manner in which the research program was being executed, Plaintiff submitted his resignation to the University. (*Id.* at ¶ 60.) Although Plaintiff's resignation became effective as of August 31, 1998, Plaintiff contends that Defendant continued to make use of the FEL equipment even after his departure. Moreover, although Plaintiff concedes that the overwhelming majority of Defendant's uses of the patented devices were for academic or experimental purposes, Plaintiff alleges that Defendant has damaged him with respect to the patented devices by depriving him "of his rights and property." (*Id.* at ¶ 57; Def.'s Ex. 4, at 173–91, Dep. of John M.J. Madey.) Plaintiff also notes that some of the research was funded by private foundations and that Defendant submitted proposals to private sources to obtain additional funding for the research program. To the extent that this occurred, Plaintiff alleges that some of the research conducted by Defendant was commercial in nature (Def.'s Ex. 4, at 173–91, Dep. of John M.J. Madey.)

As a result of all of the alleged foregoing events, Plaintiff filed the instant action, claiming infringement of the two patents (Counts I and II), conversion of property and misappropriation of business opportunities (Count III), violation of 29 U.S.C. §§ 621–634 (Count IV); violation of Plaintiff's civil rights as protected under 42 U.S.C. § 1983 (Count V), constructive fraud (Count VI), and breach of contract (Count VII). Defendant then moved to dismiss Plaintiff's Complaint, pursuant to Rules 9(b), 12(b)(1), 12(b)(6), and 12(h)(3) of the Federal Rules of Civil Procedure. Defendant's Motion to Dismiss was granted with respect to Counts IV and V; however, said motion was denied with respect to Plaintiff's other claims. Defendant has most recently filed the following motions in

response to Plaintiff's remaining claims: (1) a Motion for Partial Summary Judgment of Non–Infringement of the '103 and '994 Patents Based on Government License ("Patent Motion"); (2) a Motion for Partial Summary Judgment of Non–Infringement of the '103 Patent with Respect to the NCCU Test Stand Gun ("Test Stand Gun Motion"); and a Motion for Partial Summary Judgment on the State Law Claims ("State Law Motion"). Given Defendant's motions, the Court next turns to the standard of review for summary judgment claims.

## II. DISCUSSION

### A. Standard of Review

Summary Judgment is appropriate when "there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In making a determination on a summary judgment motion, the Court views the evidence in the light most favorable to the nonmoving party, according that party the benefit of all reasonable inferences. *See Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159; 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). However, mere allegations and denials are insufficient to establish a genuine issue of material fact. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Indeed, judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Id.* at 251, 106 S.Ct. at 2511 (quoting *Schuylkill & Dauphin Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). Therefore, a motion for summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). On the other hand, a motion for summary judgment should not be granted " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)). In light of this standard for summary judgment, each of Defendant's motions for partial summary judgment is next addressed in turn.

### B. Patent Motion

Plaintiff Madey first alleges that Defendant infringed his '103 Patent and his '994 Patent, respectively, by manufacturing and using microwave guns in its FEL Lab, and by using the "Mark III FEL" in the FEL Lab. Defendant has moved for partial summary judgment as to both of Plaintiff's claims of patent infringement, asserting that the activity about which Plaintiff complains constitutes "non-commercial, academic research," that is exempted by the experimental use exception from infringement liability. (Def.'s Mot. for Partial Summ.J. of Non–Infringement of the '103 & '994 Patents Based on Government Li-

cense, at 8.) Defendant also contends that, to the extent that "essentially all" of its research, with respect to both patents, was authorized by the Government, conducted for the Government, or funded by the Government, said research was covered by government license and, accordingly, not subject to infringement liability. (*Id.* at 3.) In light of Defendant's assertions, the Court first turns to the experimental use exception and its applicability to the case at bar.

Although the "basic law of patents establishes that unauthorized use of a patented product or process constitutes infringement," for well over a century, United States "patent jurisprudence has paid homage to ... an exception from infringement liability for ... unauthorized uses of patented inventions[,]" where the uses were solely for research, academic, or experimental purposes. *Deuterium Corp. v. United States,* 19 Cl.Ct. 624, 630 (1990); Janice M. Mueller, *No "Dilettante Affair": Rethinking the Experimental Use Exception to Patent Infringement for Biomedical Research Tools,* 76 Wash. L.Rev. 1, 17 (2001); *Whittemore v. Cutter,* 29 F.Cas. 1120 (C.C.D.Mass.1813) (No. 17,600); 5 Donald S. Chisum, *Chisum on Patents* § 16.03[1] (2000). As expressed by Justice Story in *Whittemore v. Cutter,* the case in which the experimental use doctrine originated, the underlying rationale for exempting such uses from liability is that "it could never have been the intention of the legislature to punish a man, who constructed a ... [patented device] merely for philosophical experiments ...." 29 F.Cas. at 1121. Although the scope of the defense has recently been the issue of much debate, to date, the experimental use defense remains viable and may be asserted in those cases in which the allegedly infringing use of the patent is made for experimental, non-profit purposes only. *See, e.g., Embrex, Inc. v. Ser-*

*vice Engineering Corp.,* 216 F.3d 1343, 1349 (Fed.Cir.2000) (explaining that the experimental use exception is a valid defense, but that it should not be construed "so broadly as to allow a violation of the patent laws in the guise of 'scientific inquiry,' when that inquiry has definite, cognizable, and not insubstantial commercial purposes"); *Deuterium,* 19 Cl.Ct. at 630 (instructing that an experimental use of a patented device does not constitute patent infringement); *Giese v. Pierce Chemical Co.,* 29 F.Supp.2d 33 (D.Mass. 1998) (same); Julie Cohen, *Patent Scope & Innovation in the Software Industry,* 89 Cal. L.Rev. 1, 29 (2001) ("It has been settled law that purely experimental uses were noninfringing."). Given this standard, for Plaintiff to overcome his burden of establishing actionable infringement in this case, he must establish that Defendant has not used the equipment at issue "solely for an experimental or other non-profit purpose." 5 Donald S. Chisum, *Chisum · on Patents* § 16.03[1] (2000). More specifically, Plaintiff must sufficiently establish that Defendant's use of the patent had "definite, cognizable, and not insubstantial commercial purposes." *Roche Products v. Bolar Pharm. Co.,* 733 F.2d 858, 863 (Fed.Cir.1984), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984) (explaining that the experimental use exception is truly narrow and that it bans all activities that are grounded on a *profit or commercial motive*) (superseded on other grounds by 35 U.S.C. § 271(e) (1994)); *Sawin v. Guild,* 21 F.Cas. 554, 555 (C.C.D.Mass.1813) (No. 12,390) ("[T]he making [of an invention] with an intent to use for profit, and not for the mere purpose of philosophical experiment [is actionable.] In other words, ... the making must be with an intent to infringe the patent right, and deprive the owner of the lawful rewards of his discov-

ery [to be actionable as patent infringement.]").

In this case, Plaintiff generally contends that Defendant's research in the FEL Lab was undertaken with commercial intent, thus disqualifying Defendant from the exception's protection. First, Plaintiff relies on *Pitcairn v. United States,* 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), in support of this contention. In *Pitcairn,* the patent covered rotor structures and control systems on helicopters that the plaintiff had made for the military. *See id.* at 1110–11. The Government used the patented devices on its helicopters and then claimed that its use of the patented invention was necessary to test the helicopters for "lifting ability, for the effect of vibration on installed equipment, flight speed and range, engine efficiency, and numerous other factors." *Id.* at 1125. Despite the Government's contention that its uses were only experimental in nature, the court held the experimental use exception not to apply. *See id.* at 1126. According to the court, the uses made by the Government were intended uses of the infringing patent to the extent that they were "in keeping with the legitimate business of the using agency[.]" *Id.* at 1125–26. In sum, because the helicopters employing the patented devices were not built solely for experimental purposes, but also for the purpose of benefitting the Government in its legitimate business, the exception did not apply. *See id.*

Based on the logic in *Pitcairn,* Plaintiff points to Defendant's Policy on Inventions, Patents, and Technology Transfer to argue that, because Defendant is "in the business" of "obtaining grants and developing possible commercial applications for the fruits of its 'academic research,'" the experimental use exception does not apply to the facts in this case. Despite Plaintiff's

argument, the Preamble and Objectives of the Policy on which he relies note in pertinent part:

Duke University is *dedicated to teaching, research, and the expansion of knowledge.* Although the University *does not undertake research or developmental work principally for the purpose of developing patents and commercial applications,* patentable inventions sometimes result from the research activities carried out wholly or in part with University funds and facilities. It is the policy of the University to assure the utilization of such inventions for the common good and, where necessary, to pursue patents and licenses to encourage their development and marketing. Duke University has established the following policies and procedures with respect to inventions, patents and technology transfer in order to:

A. Promote the University's *academic policy of encouraging scientific research and scholarship* ....

Given this specific language, the Policy does not indicate, as Plaintiff suggests, that Defendant is "in the business" of patenting and developing devices for *commercial purposes.* Instead, it suggests, to the contrary, that Defendant's primary purpose is to teach, research, and expand knowledge, and to not engage in patent development for the purpose of commercial benefit. Therefore, Plaintiff "has failed to produce contradictory evidence on [the matter of commercial intent] sufficient to survive summary judgment." *Planmatics, Inc. v. Showers,* 137 F.Supp.2d 616, 628 (D.Md.2001). Plaintiff's mere speculation that Defendant intends, in this case, to stray from its general policy of using patents for academic and educational purposes is insufficient to create a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct.

at 2510 (explaining that "a plaintiff [can not] rest on his allegations of [commercial intent when asserting a patent infringement claim] to get to a jury without any significant probative evidence tending to support the complaint") (quotations and internal quotation marks omitted); *Planmatics*, 137 F.Supp.2d at 628 (instructing that "[a] party may not create an issue of fact through bald assertions, unsupported contentions, and conclusory statements").

■ Plaintiff next asserts, in support of his contention that Defendant used the patented devices with commercial intent, that Defendant receives funding from both the Government and from private foundations to cover the expenses of its research program. (Pl.'s Mem. of Law in Opp'n to Duke University's Mots. for Summ. J., at 6.) Despite Plaintiff's reliance on the sources of Defendant's funding, however, the fact that Defendant, as a non-profit institution, has obtained funding from extrinsic sources to fund the program's expenditures does not suggest improper, non-experimental use of the patent, financial gain, or commercial intent, particularly in light of the fact that Defendant has asserted and presented evidence that all of its uses of the devices covered by the '103 and '994 Patents have been in furtherance of its educational purpose or for experimentation only. *See Ruth v. Stearns–Roger Mfg. Co.*, 13 F.Supp. 697, 713 (D.Colo. 1935) (concluding that the experimental use exception applies when a university uses a patented device in furtherance of its educational purpose), *rev'd on other grounds*, 87 F.2d 35 (10th Cir.1936); Ronald D. Hantman, *Experimental Use as an Exception to Patent Infringement*, 67 J. Pat. Off. Soc'y 617, 633 (1985) (noting that, in light of *Ruth*, "[f]ew would deny the experimental use exception for research on patented technology performed at a university in furtherance of its educational function"). Without more concrete evidence to rebut Defendant's stated purpose with respect to its research in the FEL Lab, Plaintiff has failed to meet its burden of establishing patent infringement by a preponderance of the evidence. *See, e.g., Afande v. National Lutheran Home for the Aged*, 868 F.Supp. 795, 802 (D.Md. 1994) (explaining that "neither speculative assertions, possibilities of factual disputes, nor a scintilla of evidence in support [of a plaintiff's] position will suffice" to withstand summary judgment) (citations omitted). Specifically, Plaintiff's unsubstantiated allegations of commercial intent, based simply upon the method by which Defendant funds its experimental research, are not sufficient to survive summary judgment. *See Planmatics*, 137 F.Supp.2d at 627.

■ Plaintiff next asserts that the experimental use exception does not apply to the case at bar because Defendant claimed "a proprietary interest in the details of its work at the FEL Lab during discovery in this case." (Pl.'s Mem. of Law in Opp'n to Duke University's Mots. for Summ. J., at 6–7.) This type of assertion, from which the Court would have to draw "leaping inferences", is not enough to withstand summary judgment. *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 363 (4th Cir. 1983) (noting that "leaps of inference [cannot] be made under the legal constraints imposed by applicable proof burdens and the requirements of demonstrable rationality in the fact-finding process"), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985); *McClamb v. Rubin*, 932 F.Supp. 706, 712 (M.D.N.C.1996) (explaining that a plaintiff cannot survive summary judgment through mere speculation or the building of one inference upon another) (citations omitted). Specifically, even assuming that Plaintiff's unsupported allegation is correct, the Court would have to infer from the fact that Defendant has claimed ownership in some of its research

that it intends to take commercial advantage thereof. Such an inference cannot reasonably be drawn at this point, in light of Defendant's prior uses of the patented devices, which, without a contrary showing by Plaintiff, have all been experimental or educational in nature.

■ For all of the foregoing reasons, the Court concludes that Plaintiff's broad assertions and mere speculation as to Defendant's intent to commercially benefit from the devices covered by the '994 and the '103 Patents fail to create a genuine issue of material fact. *See Afande*, 868 F.Supp. at 802. As the Court has previously mentioned, judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511 (quoting *Schuylkill & Dauphin Improvement Co. v. Munson*, 81 U.S. (14 Wall.) at 448, 20 L.Ed. at 872). Because the evidence presented in this case is not of such a character "that it would warrant the jury in finding a verdict" in Plaintiff's favor, Defendant's Patent Motion is GRANTED.[2]

To the extent that the Court has granted Defendant's Patent Motion, Defendant's

2. The Court notes at this point that Plaintiff has also presented certain supplemental evidence in support of his infringement claim, on which he did not rely in his response brief. Specifically, Plaintiff has presented testimony about a fee that Defendant has established for industrial users wishing to use the FEL Lab's resources. (Def.'s Ex. 4, at 173–91.). Although this fee has been in existence for some time, it has not yet been applied. In fact, all users to date, even by Plaintiff's own acknowledgment, have been faculty members of Duke, other academics, or non-industrial users seeking to pursue experimental interests. (*See id.*) Therefore, Plaintiff's mere speculation and general averment that such a fee establishes commercial intent, in light of all of the other non-speculative evidence suggesting the contrary, are insufficient to sustain Plaintiff's claim of infringement. *See, e.g., Planmatics*, 137 F.Supp.2d at 628 ("[U]nsubstantiated allegations . . . are not sufficient to survive summary judgment. A party may not create an issue of fact through bald assertions, unsupported contentions, and conclusory statements.") (citations omitted).

The Court also notes that Plaintiff has attested that Defendant both posted information on its website and issued public announcements on five research programs that are to be carried out at Defendant's new technology center, the Fitzpatrick Center for Photonics & Communication Systems. (Supplemental Aff. of John M.J. Madey ¶ 14.). According to Plaintiff, two of these research programs "in-

volve" FEL technology. (*Id.*) Plaintiff further claims that Defendant's website indicates that Defendant will engage in corporate partnerships in furtherance of its research goals. (Id.¶ 15.) Plaintiff then concludes that "[i]t is evident from these materials that research activity is currently underway and that greater use of the patented equipment is planned." However, despite Plaintiff's assertions and conclusions with respect to these informational sources, the text to which Plaintiff points in support of his claim is too broad and too vague to establish that Defendant intends to commercially benefit from the *FEL technology* specifically, which composes only a portion of the technology to be used by the center for its programs. Moreover, even assuming that the language to which Plaintiff points does apply to the use of FEL technology in the new center, this language refers to the development and licensing of *new* technology, and not of equipment or patents currently in existence. Therefore, Plaintiff has not presented enough evidence from which a reasonable jury can conclude that the objectives of the center with respect to Plaintiff's FEL technology are improper, and Plaintiff's mere forecast of the same is not legally competent evidence sufficient to rebut Defendant's evidence of non-commercial intent. *Planmatics*, 137 F.Supp.2d at 628 (explaining that a plaintiff must produce "legally competent evidence from [which] a jury could reasonably" conclude in the plaintiff's favor); *Miller v. Bristol–Myers Squibb Co.*, 121 F.Supp.2d 831, 837 (D.Md.2000) (same).

alternative argument that "essentially all" of its uses with respect to the '994 and '103 Patents were covered by Government license is moot. The Court does note, however, as it did previously when ruling upon Defendant's Motion to Dismiss, that all uses that have been made of the patented devices that are covered by such a license are not subject to infringement liability.[3]

### C. Test Stand Gun Motion

▪ Defendant next moves for partial summary judgment on Plaintiff's claim that both Defendant's manufacture of the test gun and its use of that gun since June of 1997 (hereinafter, the period following June of 1997 will be referred to as "the relevant date") infringe the '103 Patent. According to Defendant, the manufacture, itself, of the test gun does not give rise to a meritorious infringement claim, because the test gun was manufactured with Plaintiff's consent. As to Plaintiff's claim that Defendant's use of the test gun after the relevant date constitutes patent infringement, Defendant simply alleges that said claim is without merit, because it has not used the test gun since the relevant date.

The federal patent statute helps to shed light on the merits of Defendant's motion for partial summary judgment.

The federal patent statute provides, in pertinent part, that "whoever *without authority* makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (emphasis added). In light of this standard, the Court next turns to whether Plaintiff correctly asserts that Defendant's manufacture of the test gun constitutes actionable infringement. Unless Plaintiff can establish that Defendant's manufacture of the test gun was "without [Plaintiff's] authority," Defendant's motion with respect to the gun's manufacture must be granted. Plaintiff, however, is unable to make such a showing.

Specifically, the NCCU test stand gun was assembled and installed in the Physics Building at Duke while Plaintiff was employed at the FEL Lab. In fact, *by Plaintiff's own admission,* Plaintiff had knowl-

---

**3.** Such a conclusion is supported by the Bayh–Dole Act, 35 U.S.C. §§ 200–212, which establishes that the Government has an irrevocable paid up license to have patents practiced on its behalf, where it has funded the development of such patents. Specifically, the Act provides:

(c) Each funding agreement [between the Government and] a ... nonprofit organization shall contain appropriate provisions to effectuate the following:

. . .

(4) With respect to any invention in which the contractor elects rights [to the invention], the Federal Agency shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world

. . . . .

35 U.S.C. § 202(c)(4). In this case, the funding agreements for the inventions created un-

der the '994 and '103 patents expressly provide that the Government retained rights in those inventions. Therefore, in light of the Bayh–Dole Act and said funding agreements, those uses that Defendant has made with respect to the '103 and '994 Patents that have been authorized by the Government do not constitute patent infringement to the extent that such uses are protected by an irrevocable government license.

Although the parties have presented conflicting evidence as to the extent to which the patented devices have been used for a purpose consented to by the Government, because Plaintiff has failed to create a genuine issue of material fact as to whether Defendant has commercially benefitted or intends to do so with respect to the patents at issue, the uses that have been made to date with respect to both patents are, at this point, exempt from infringement liability.

edge that the NCCU test stand gun was being constructed, and even supervised the construction thereof. (Def.'s Ex. B, p. 160.) Plaintiff's authorization of the test gun's manufacture is further evidenced by the fact that following completion of the test gun, Defendant, with Plaintiff's assistance, submitted a research proposal to NCCU, proposing to assist in the commissioning and characterization of the gun. (Def.'s Ex. A, App. A, pp. 1–2.) Importantly, Plaintiff endorsed this research proposal by naming himself as Principal Investigator and by signing the proposal on Defendant's behalf. In light of the foregoing facts, Plaintiff unquestionably authorized the manufacture by Defendant of the test gun. Accordingly, Plaintiff's claim of patent infringement must fail, and Defendant's motion for partial summary judgment as to the manufacture of the test gun is GRANTED.

Defendant next moves for partial summary judgment on Plaintiff's claim that Defendant's "use and operation" of the test gun after the relevant date infringes the '103 Patent. According to Defendant, this motion should be granted because, contrary to Plaintiff's allegations, it did not use the test gun after the relevant date. In support of its motion, Defendant relies on the affidavit of Dr. Charles Ronald Jones, a professor at NCCU.

In his affidavit, Dr. Jones attests that he is the only person authorized by the Duke Radiation Safety Committee to operate the NCCU test stand gun. (Def.'s Ex. A ¶ 14.) In fact, Dr. Jones must be physically present for the NCCU test stand gun to be turned on. (See id.) To ensure that no one else uses the device without Dr. Jones' authorization, there is a key switch to the NCCU test stand gun to which Dr. Jones has sole access. (See id.) Considering this fact, Dr. Jones would have direct knowledge if Defendant's employees used or operated the NCCU test stand gun for any reason after the relevant date. Yet, according to Dr. Jones, he "is unaware of any Duke faculty member or employee [who has used or operated] the NCCU test stand gun at any time since at least June of 1997," the date on which Plaintiff alleges Defendant's infringement of the '103 Patent began. (Id. ¶ 15.) To the extent that Dr. Jones, the sole holder of the key to the test gun, has stated that Defendant's employees and faculty members have not made use of the test gun since the relevant date, no genuine issue of material fact exists as to this point. This is true to the extent that Plaintiff's bald allegations and mere speculation in contradiction of Dr. Jones' testimony are insufficient to withstand summary judgment.[4]

Plaintiff next argues that Defendant is liable for patent infringement to the extent that *NCCU* professor Dr. Jones has used the test gun since the relevant date. In support of this argument, Plaintiff alleges that Dr. Jones is an authorized agent of the University, and that Dr. Jones has co-authored publications with members of the Duke faculty. (Pl.'s Mem. of Law in Opp'n to Duke University's Mots. for Summ. J., at 2–3.) However, Plaintiff's assertions of

---

4. The Court also notes at this point that Plaintiff asserts that graduate students at the University have made use of the gun for educational purposes since the relevant date. (Pl.'s Mem. of Law in Opp'n to Duke University's Mots. for Summ. J., at 2–3.) Even assuming Plaintiff's version of these facts to be true, the experimental use exception would foreclose Plaintiff's claim of patent infringe-

ment. Moreover, Dr. Jones testified, contrary to Plaintiff's assertions, that no student from the University has made use of the test gun since June of 1997. (Ex. 1, Jones Aff. ¶¶ 2–6.) Once again, Plaintiff's general averments, without supporting evidence, contradicting this testimony do not suffice to create a genuine issue of material fact.

agency and of publication by Defendant's faculty members after the relevant date are directly refuted by a second affidavit that was submitted by Dr. Jones. In this second affidavit, Dr. Jones attested that he is not and has never been the authorized agent of Defendant, that Defendant has no control over the operation of the test gun, that the gun is not operated under the control of or for the benefit of Duke, and that all of his publications that were co-authored by Duke faculty members either involved research conducted prior to the relevant date, or did not, in any manner, involve use or operation of the test gun. (Ex. 1, Jones Aff. ¶¶ 2–6.) Not only does the affidavit of Dr. Jones establish that he was not an agent of Duke University, but the subcontract entered into by the parties with respect to the test gun also supports such a conclusion. Specifically, the subcontract expressly provides that "[Duke's] relationship to NCCU under [the] agreement [was] that of an independent Contractor and not an agent, joint venturer or partner of NCCU," suggesting that agency liability does not exist, on either side. In light of these facts, Plaintiff's attempt to hold Defendant accountable for patent infringement because of Dr. Jones' use of the test gun is fatally flawed. For the foregoing reasons, Defendant's Motion for Partial Summary Judgment of Non–Infringement with Respect to the NCCU

Test Stand Gun is GRANTED in all respects.[5]

The Court notes at this point that the parties have presented a substantial amount of evidence with respect to the state law claims at issue in this case, in response to and in support of Defendant's State Law Motion.[6] Although the Court has reviewed the aforementioned evidence, the Court will, in its discretion, decline to exercise supplemental jurisdiction over said claims. Specifically, to the extent that summary judgment has been granted on all of Plaintiff's federal law claims, Plaintiff's state law claims are dismissed without prejudice.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment of Non–Infringement of the '103 and '994 Patents Based on Government License and Defendant's Motion for Partial Summary Judgment of Non–Infringement with Respect to the NCCU Test Stand Gun are GRANTED. Furthermore, because the Court will grant Defendant's motions for partial summary judgment on Plaintiff's federal claims, the Court will not consider Defendant's motion for partial summary judgment as to Plaintiff's remaining state law claims. Instead, pursuant to 28 U.S.C.

5. Although Plaintiff contends in his First Amended and Supplemental Complaint that Defendant infringed his '103 Patent by manufacturing and *previously* using the test gun after the relevant date, in Plaintiff's Supplemental Affidavit, he seemingly suggests that Defendant plans to infringe his '103 Patent *in the future* to the extent that it plans to use the test gun in its new research center. However, for the same reasons that the Court has concluded that the information in the alleged website is insufficient to withstand summary judgment as to the Patent Motion, the Court makes the same finding with respect to the Test Stand Gun Motion. Plaintiff's claim is

too speculative at this point to create a genuine issue of material fact.

6. Specifically, Defendant has moved for summary judgment in its State Law Motion on Plaintiff's state law claims of conversion of property, misappropriation of business opportunities, constructive fraud, and breach of contract. To address these claims, both parties have presented numerous documents as to the proper owner of the patented equipment currently housed at Duke. The issue of ownership, however, was not essential to the Court's determination of the patent infringement issues addressed herein.

§ 1367(c)(3), the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss said claims without prejudice.