**John M.J. MADEY, Plaintiff,**

v.

**DUKE UNIVERSITY, Defendant.**

**No. 1:97CV01170.**

United States District Court,
M.D. North Carolina.

Sept. 20, 2004.

Randall M. Roden, Tharrington Smith, Raleigh, NC, James Lee Lester, MacCord Mason, PLLC, Greensboro, NC, for Plaintiff and Counter–Defendant.

John M. Simpson, Fulbright & Jaworski, L.L.P., Washington, DC, for Defendant and Counter–Claimant.

## MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court after being remanded by the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). Plaintiff Dr. John M.J. Madey ("Dr. Madey" or "Plaintiff") claims that Defendant Duke University ("Duke" or "Defendant") violated 35 U.S.C. § 271(a) by infringing on two of Plaintiff's patents. Plaintiff also brings related state-law claims against Defendant for conversion of property and perhaps a claim for misappropriation of business opportunities (third claim), constructive fraud (sixth claim), and breach of contract (seventh claim). In light of the Federal Circuit's remand of this case, the question before the Court is whether Defendant is entitled to summary judgment at this time on any or all of Plaintiff's claims.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This Court discussed the relevant facts in its June 15, 2001, Opinion (the "Summary Judgment Opinion"). *Madey v. Duke Univ.*, 266 F.Supp.2d 420, 421–24 (M.D.N.C.2001), *aff'd in part, rev'd in part, and remanded*, 307 F.3d 1351 (Fed. Cir.2002), *cert. denied*, 539 U.S. 958, 123 S.Ct. 2639, 156 L.Ed.2d 656, *subsequent appeal denied per curiam*, 78 Fed. Appx. 105 (Fed.Cir.2003). As such, the Court will restate only those facts from its earlier Opinion that are necessary to resolve the issues presently before this Court.

Dr. Madey is an internationally known scientist and scholar in the field of electromagnetic radiation and its uses. Dr. Madey was hired by Defendant in 1989 as a professor, primarily to assist Duke in establishing a Free Electron Laser Laboratory ("FEL Lab") and research program. Before coming to Duke, Plaintiff secured United States Patent Number 4,641,103 for the microwave electron guns now used in the FEL Lab ("the '103 Patent"). Plaintiff is also the co-owner and exclusive patent holder for United States Patent Number 5,130,994 ("the '994 Patent"), the patent that covers the Mark III, a Free Electron Laser that is also currently in use in the FEL Lab.

Prior to coming to Duke, Plaintiff was a professor and researcher at Stanford University. Before Plaintiff accepted a position with Duke, Plaintiff contends that he thought it necessary, based on his prior experiences with Stanford University, to obtain certain assurances from Duke covering his work and the equipment that would be used in furtherance thereof. Accordingly, Plaintiff and Defendant allegedly entered into a Research Agreement that detailed the terms upon which Plaintiff would transfer to Duke. According to Plaintiff's First Amended and Supplemental Complaint ("Amended Complaint"), the Research Agreement provided for the following arrangements: that Plaintiff would become a tenured faculty member of the Department of Physics, as outlined in the Duke University Faculty Handbook, that Plaintiff would locate his research and patented equipment in the FEL Lab con-

structed by Duke, that Plaintiff would assist the University in obtaining research grants and serve as Principal Investigator of said grants, that Plaintiff would be the Director of the FEL Lab, and that Plaintiff would be permitted to pursue research of interest to him using the laboratory's equipment and facilities. (Am. Compl. ¶ 14.)

Duke subsequently entered into a subcontract with North Carolina Central University ("NCCU") with respect to research regarding a "test stand gun" to be assembled and installed at the Physics Building on Duke's campus. Under the subcontract, Duke was to assist NCCU in performing its research of the test gun, which was patterned on the microwave gun of the MKIII FEL. Dr. Charles Ronald Jones, an NCCU professor, was the Principal Investigator under the subcontract.

Following Plaintiff's arrival at Duke, Plaintiff assisted Duke in obtaining a federal research grant from the Office of Naval Research (the "ONR grant"). (Am. Compl. ¶ 21.) Under the terms of the ONR grant, Plaintiff was to be the Principal Investigator for the research conducted by the University. (Id. ¶ 22.) The agreement further provided that Plaintiff would have the authority to direct the research and expenditure of grant funds in accordance with the terms and conditions of the grant proposal. (See id.) Despite the terms set forth in the proposal, Plaintiff claims that Duke University revised the plans for construction of the FEL Lab in order to accommodate the research interests of other professors in the field of nuclear physics. (Id. ¶ 32.) Plaintiff objected to the changed plans on scientific grounds and because he considered the changed plans to be an improper diversion of federal research funds. (Id. ¶ 40.) According to Plaintiff, as a result of his objections, Defendant conspired to take control of the FEL Lab and his patented technolo-gy. (Id. ¶ 42.) Plaintiff further claims that when he objected to the changed plans, members of Duke's faculty conceived of a plan to remove Plaintiff from his position of authority by engaging in the following courses of action. First, a second Director was appointed to run the FEL Lab along with Plaintiff, thereby creating a situation wherein Plaintiff's objections to changes within the Lab could be neutralized by the second Director. (Id. ¶ 43). Second, Defendant created an advisory committee composed of senior administrators committed to the changed plans advocated by Defendant. (Id. ¶ 44.) This committee had the power to veto decisions made by Plaintiff. (Id.) Finally, Plaintiff alleges that after he objected to these changes in the management of the Lab, Defendant removed him from his position as Director of the Lab and petitioned the Office of Naval Research to remove Plaintiff from his position as Principal Investigator on the ONR grant. (Id. ¶¶ 52–56.) Plaintiff claims that, following his removal, Defendant's officials asserted control and authority over all aspects of the research project, including the hiring and firing of personnel, the procurement of equipment and supplies, and other decisions that were within the responsibility of the Principal Investigator. (Id. ¶ 54.) Shortly upon being removed from his position, and because Plaintiff objected to the manner in which the research program was being executed, Plaintiff submitted his resignation to Duke. (Id. ¶ 60.) Although Plaintiff's resignation became effective on August 31, 1998, Plaintiff contends that Defendant continued to make use of the FEL equipment even after his departure. Moreover, Plaintiff alleges that Defendant has damaged him with respect to the patented devices by depriving him "of his rights and property." (Id. ¶ 57; Def.'s Ex. 4, at 173–91, Dep. of John M.J. Madey.)

As a result of the alleged foregoing events, on November 5, 1997, Plaintiff filed a lawsuit in this Court, claiming infringement of the '103 patent (first claim), infringement of the '994 patent (second claim), conversion of property and misappropriation of business opportunities (third claim), age discrimination in violation of 29 U.S.C. §§ 621–634 (fourth claim), violation of Plaintiff's civil rights as protected under 42 U.S.C. § 1983 (fifth claim), constructive fraud (sixth claim), and breach of contract (seventh claim). Defendant then moved to dismiss Plaintiff's first claim pursuant to Federal Rule of Civil Procedure 12(b)(1) and Plaintiff's first, third, fourth, fifth, sixth, and seventh claims pursuant to Rule 12(b)(6). In a Memorandum Opinion and Order and Judgment dated December 1, 1997 (the "Dismissal Opinion"), the Court granted in part and denied in part Duke's Motion to Dismiss Plaintiff's first claim pursuant to Rule 12(b)(1), finding that it lacked jurisdiction over a portion of Plaintiff's first claim under 28 U.S.C. § 1498. The Court reasoned as follows:

> [Duke's] motion is granted with respect to Plaintiff's infringement claims which are based upon allegations of patent use by Defendant Duke University pursuant to government research grants issued to the University. However, Defendant's motion is denied with respect to Defendant's alleged use of the patent for private purposes outside the scope of the government's retained right in the patent.

*Madey v. Duke Univ.*, No. 1:97CV1170, slip op. at 39 (M.D.N.C. Dec. 1, 1997), *aff'd in part, rev'd in part, and remanded*, 307 F.3d 1351 (Fed.Cir.2002), *cert. denied*, 539 U.S. 958, 123 S.Ct. 2639, 156 L.Ed.2d 656, *subsequent appeal denied per curiam*, 78 Fed. Appx. 105, 2003 WL 22344968 (Fed. Cir.2003). The Court further granted Defendant's Motion to Dismiss Plaintiff's fourth and fifth claims pursuant to Rule 12(b)(6). *Id.* The Court, however, denied Duke's Motion to Dismiss Plaintiff's first, third, sixth, and seventh claims. *Id.*

Following the Court's Dismissal Opinion, the parties proceeded with discovery on Plaintiff's remaining claims. Defendant then filed three Partial Motions for Summary Judgment: (1) a Motion for Partial Summary Judgment of Non–Infringement of the '103 and '994 Patents Based on Government License ("Patent Motion") [Document # 65]; (2) a Motion for Partial Summary Judgment of Non–Infringement of the '103 Patent with Respect to a Test Stand Gun owned by North Carolina Central University ("NCCU") ("Test Stand Gun Motion") [Document # 60]; and a Motion for Partial Summary Judgment on the State Law Claims ("State Law Motion") [Document # 63].

On June 15, 2001, the Court ruled on Defendant's various Motions. The Court granted the Patent Motion, holding that the experimental use defense barred Plaintiff's patent-infringement claims against Duke. The Court also granted the Test Stand Gun Motion, holding that the record established, as a matter of law, that NCCU owned the Microwave Gun Test Stand and Dr. Jones of NCCU controlled the test gun with a key switch. Accordingly, the Court found that Plaintiff had failed to demonstrate a genuine issue of material fact with respect with either of his patent infringement claims (first and second claims). The Court therefore declined, in its discretion pursuant to 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over Dr. Madey's state-law claims (third, sixth, and seventh claims) and thus dismissed those claims without prejudice.

Dr. Madey appealed both the Court's December 1, 1999, Order and Judgment and the Court's June 15, 2001, Order and Judgment to the Federal Circuit. On October 3, 2002, the Federal Circuit issued

an Opinion affirming in part and reversing in part this Court's decisions, and remanding the matter to this Court for further proceedings. *Madey v. Duke Univ.*, 307 F.3d 1351 (Fed.Cir.2002), *cert. denied,* 539 U.S. 958, 123 S.Ct. 2639, 156 L.Ed.2d 656, *subsequent appeal denied per curiam,* 78 Fed. Appx. 105, 2003 WL 22344968 (Fed. Cir.2003). With respect to the Dismissal Opinion, the Federal Circuit held that this Court misapplied 28 U.S.C. § 1498 and improperly dismissed a portion of Plaintiff's infringement claims under the '103 patent pursuant to Rule 12(b)(1). With respect to the Summary Judgment Opinion, the Federal Circuit affirmed this Court's disposition of Defendant's Test Stand Gun Motion, finding that this Court properly granted summary judgment to Duke. *Id.* at 1363. The Federal Circuit, however, reversed this Court's disposition of the Patent Motion, finding that this Court's application of the experimental use defense was improper. Thus, the Federal Circuit remanded the Patent Motion to this Court for further proceedings, specifically to determine whether Duke was entitled to a judgment in its favor based upon the three affirmative defenses asserted by Duke: (1) experimental use, (2) government license, and (3) 28 U.S.C. § 1498. Finally, with respect to the state-law claims, the Federal Circuit ruled that, "given our reversal of the district court's application of the experimental use defense, these claims are still initially available to Madey." *Id.* at 1364.

On January 2, 2003, Duke filed a petition for a writ of certiorari with the Supreme Court, which was denied on June 27, 2003. *Duke Univ. v. Madey,* 539 U.S. 958, 123 S.Ct. 2639, 156 L.Ed.2d 656, *subsequent appeal denied per curiam,* 78 Fed. Appx. 105, 2003 WL 22344968 (Fed.Cir.2003). The Federal Circuit then denied a subsequent appeal on October 8, 2003. *Madey v. Duke Univ.,* 78 Fed. Appx. 105, 2003 WL 22344968 (Fed.Cir.2003) (per curiam).

This Court held a status conference on this matter on August 25, 2003.

In light of the Federal Circuit's ruling and the arguments made by the parties at the status conference, this Court finds it appropriate to address Plaintiff's and Defendant's arguments with respect to all of Plaintiff's claims and all of Duke's defenses. In doing so, the Court will again address Defendant's Patent Motion and its State Law Motion and make the following determinations: First, whether summary judgment is appropriate on any of Plaintiff's claims. Second, if summary judgment is not appropriate at this time, whether the parties should be granted leave to file any additional dispositive motions in light of the Federal Circuit's opinion in order to assist this Court in narrowing the issues for trial. As such, the Court will now address Plaintiff's claims, beginning with his federal claims for patent infringement.

## III. DEFENDANT'S PATENT MOTION AND STATE LAW MOTION

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Cole-*

man & Assocs., Inc., 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992) (en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Catawba Indian Tribe*, 978 F.2d at 1339. In other words, the nonmoving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe*, 978 F.2d at 1339.

### B. Patent Motion

The Court will first discuss Defendant's Patent Motion, in which Defendant argues that the Court should grant it summary judgment with respect to Plaintiff's patent infringement claims (first and second claims). In support of its Patent Motion, Duke asserts three affirmative defenses to patent infringement liability. First, with respect to Plaintiff's first claim (the '103 Patent Claim), Defendant contends that because Duke's use of the '103 patent was "by or for the United States," Duke is not liable for infringement. *See* 28 U.S.C. § 1498.[1] Second, Duke asserts what it characterizes as the "government license defense." Duke claims under the Bayh–Dole Act, 35 U.S.C. §§ 200–212, that because "essentially all of Duke's allegedly infringing activities consist of research being conducted either pursuant to government research grants or in order to obtain such grants," Duke is not liable for infringement on either the '103 or '994 patents. (Mem. Supp. Patent Mot. [Document # 65] at 8.) Third, Duke contends that because "[t]he remainder of the allegedly infringing activities consist of research being conducted either pursuant to government research grants or in order to obtain such grants," Duke is not liable for infringement because of the "experimental use defense." The Court finds it appropriate to discuss Duke's arguments in reverse order, and the Court will therefore first discuss the application of the experimental use defense to this case.

### 1. Experimental Use Defense

a. Whether Summary Judgment Should Be Granted to Duke on the Basis of the Experimental Use Defense

Duke contends that its research with respect to the '103 and '994 patents was

---

1. As discussed more fully below, Duke did not actually assert the 28 U.S.C. § 1498 defense at the summary judgment stage but instead asserted it at the motion-to-dismiss stage. For the purposes of this Opinion, however, the Court assumes that Duke is still asserting that § 1498 provides an affirmative defense for infringement with respect to the '103 patent. As such, the Court finds it appropriate to address the § 1498 defense in the context of the Court's disposition of Defendant's Patent Motion.

done "for the sole purpose of gratifying a philosophical taste, or curiosity, or for mere amusement ...." *Poppenhusen v. Falke,* 19 F.Cas. 1048, 1049 (C.C.N.Y. 1861). In its previous Summary Judgment Opinion, this Court relied upon a number of cases from Federal Circuit (including its predecessor courts), as well as a leading case from the District of Colorado, and held, in pertinent part, that

> [a]lthough the scope of the [experimental use] defense has recently been the issue of much debate, to date, the experimental use defense remains viable and may be asserted in those cases in which the allegedly infringing use of the patent is made for experimental, non-profit purposes only. Given this standard, for Plaintiff to overcome his burden of establishing actionable infringement in this case, he must establish that Defendant has not used the equipment at issue solely for an experimental or other non-profit purpose. More specifically, Plaintiff must sufficiently establish that Defendant's use of the patent had definite, cognizable, and not insubstantial commercial purposes.

*Madey,* 266 F.Supp.2d at 425 (internal quotations omitted) (citations omitted).

In light of the Court's interpretation of this authority and a careful review of the evidence before the Court, the Court concluded that Plaintiff " 'ha[d] failed to produce contradictory evidence on [the matter of commercial intent] sufficient to survive summary judgment.' " *Id.* at 426 (second alteration in original) (quoting *Planmatics, Inc. v. Showers,* 137 F.Supp.2d 616, 628 (D.Md.2001)). The Court found that "Plaintiff's mere speculation that Defendant intends, in this case, to stray from its general policy of using patents for academic and educational purposes is insufficient to create a genuine issue of material fact." *Id.* In summary, therefore, the Court found that "Plaintiff ha[d] failed to meet its burden of establishing patent infringement by a preponderance of the evidence." *Id.* at 427.

The Federal Circuit reversed this Court's ruling on the experimental use defense. First, the Federal Circuit held that this Court improperly shifted the burden to Dr. Madey to "establish that Duke did not use the patent-covered free electron laser equipment solely for experimental or other non-profit purposes," finding that this Court improperly "folded the experimental use defense into the baseline assessment as to whether Duke infringed the patents." *Madey,* 307 F.3d at 1361. The Federal Circuit thus held that this Court "erroneously required Madey to show as a part of his initial claim that Duke's use was not experimental. The defense, if available at all, must be established by Duke."[2] *Id.*

Second, the Federal Circuit held that this Court "had an overly broad conception of the very narrow and strictly limited experimental use defense." *Id.* In the

---

**2.** Although this Court did use language suggesting that Plaintiff failed to meet his burden with respect to the experimental use defense, it was not the Court's intention to shift the ultimate burden on the experimental use defense to Plaintiff. Rather, the Court actually found that Plaintiff was unable to rebut Defendant's affirmative showing that it was entitled, as a matter of law, to the experimental use defense. However, in light of the Federal Circuit's further limitation of the experimental use defense (discussed more fully *infra*), the Court now finds that Defendant is unable to establish its entitlement to the experimental use defense. *See Catawba Indian Tribe of S.C. v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992) (en banc) (holding that the moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law"). Because Defendant fails to meet its burden, the burden never shifts to Plaintiff to set forth specific facts showing that there is a genuine issue for trial. *Id.*

Summary Judgment Opinion, this Court relied in part upon *Ruth v. Stearns–Roger Manufacturing Co.*, which held that the experimental use exception applies when a university uses a patented device in furtherance of its educational purpose. 13 F.Supp. 697, 713 (D.Colo.1935), *rev'd on other grounds*, 87 F.2d 35 (10th Cir.1936). As Ronald D. Hantman stated in his law review article on the subject, in light of *Ruth*, "[f]ew would deny the experimental use exception for research on patented technology performed at a university in furtherance of its educational function." Ronald D. Hantman, *Experimental Use as an Exception to Patent Infringement*, 67 J. Pat. Off. Soc'y 617, 633 (1985).

The Federal Circuit, however, found both this Court's application of prior Federal Circuit precedent and this Court's reliance upon *Ruth* to be in error. The Federal Circuit reasoned as follows:

> The district court stated that the experimental use defense inoculated uses that "were solely for research, academic, or experimental purposes," and that the defense covered use that "is made for experimental, non-profit purposes only." Both formulations are too broad and stand in sharp contrast to our admonitions in *Embrex* and *Roche* that the experimental use defense is very narrow and strictly limited. In *Embrex*, we followed the teachings of *Roche* and *Pitcairn* to hold that the defense was very narrow and limited to actions performed "for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry." Further, use does not qualify for the experimental use defense when it is undertaken in the "guise of scientific inquiry" but has "definite, cognizable, and not insubstantial commercial purposes." The concurring opinion in *Embrex* expresses a similar view: use is disqualified from the defense if it has the "slightest commercial implication." Moreover, use in keeping with the legiti-

mate business of the alleged infringer does not qualify for the experimental use defense. The district court supported its conclusion with a citation to *Ruth v. Stearns–Roger Mfg. Co.*, 13 F.Supp. 697, 713 (D.Colo.1935), a case that is not binding precedent for this court.

*Id.* at 1361–62 (citations omitted).

The Federal Circuit thus instructed this Court "to significantly narrow and limit its conception of the experimental use defense." The correct focus should not be on the non-profit status of Duke but on the legitimate business Duke is involved in and whether or not the use was solely "for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry." The Federal Circuit provided the following guidance with respect to this instruction:

> Our precedent clearly does not immunize use that is in any way commercial in nature. Similarly, our precedent does not immunize any conduct that is in keeping with the alleged infringer's legitimate business, regardless of commercial implications. For example, major research universities, such as Duke, often sanction and fund research projects with arguably no commercial application whatsoever. However, these projects unmistakably further the institution's legitimate business objectives, including educating and enlightening students and faculty participating in these projects. These projects also serve, for example, to increase the status of the institution and lure lucrative research grants, students and faculty.

*Id.* at 1362.

■ Therefore, this Court must determine whether Duke has established that its alleged use of Plaintiff's patented inventions was not in keeping with its legitimate business as an educational institution but was instead solely for amusement, to satis-

fy idle curiosity, or for strictly philosophical inquiry. The Court finds that, given the evidence before the Court, Duke has failed to meet its burden that it is entitled to summary judgment on the experimental use defense. In fact, Duke previously stated in its Memorandum in Support of its Patent Motion that "Duke is conducting its allegedly infringing research in a laboratory *in furtherance of the school's educational purpose.*" (Def.'s Mem. Supp. Patent Mot. at 9 (emphasis added).) Thus, Duke has conceded that at least some of its uses of Plaintiff's patents "unmistakably further [its] legitimate business objectives, including educating and enlightening students and faculty participating in these projects." *Madey,* 307 F.3d at 1362. In light of the Federal Circuit's Opinion narrowly construing the experimental use defense, the Court finds that Duke has failed to demonstrate that it is entitled to this defense as a matter of law. As such, to the extent that Duke's Patent Motion for Summary Judgment is based upon the experimental use defense, that Motion must be denied.

b. Whether Further Factual and Legal Development of the Experimental Use Defense Would be Appropriate Prior to Trial

Having determined that the record before the Court does not support Duke's Motion for Summary Judgment on the basis of the experimental use defense, the next question for the Court is whether this Court should allow the parties to present additional briefing and arguments to the Court with respect to this defense at this time. The Court finds that further motions or supplementation of the record with respect to the experimental use defense at this time would be unnecessary. Duke has offered absolutely no evidence showing that it is entitled to this defense. Rather, as discussed above, it has actually conceded that this research was done in furtherance of its legitimate business purposes, that is, educating its students, and it has offered no indication of any evidence it could offer to support this defense. In its Statement on the Course of Future Proceedings in this Matter, Duke stated that with respect to the experimental use defense it "is prepared to stand on the briefing it has already submitted on summary judgment . . . ." (Def.'s Statement on Course of Future Proceedings [Doc. # 142] at 7.) This Court, however, has determined that Duke's briefing and evidence presently before the Court on the experimental use defense are insufficient to entitle it to summary judgment. Accordingly, because Duke has made no showing as to why additional motions or proceedings on the experimental use defense would be useful, the Court will not allow any at this time.

That said, however, if Duke is able to marshal additional evidence on the experimental use defense, Duke may offer this evidence at trial. However, given the Federal Circuit's extremely narrow conception of the experimental use defense and the total lack of evidence currently in the record, the Court has doubts about whether Duke will be able to provide any evidence in support of its experimental use defense. Regardless, these are issues to be resolved at trial, and the Court will address any additional arguments or evidence with respect to the experimental use defense at that time.

2. Government License Defense

a. Whether Summary Judgment Should Be Granted to Duke on the Basis of the Government License Defense

In addition to its reliance on the experimental use defense, Duke also claims that this Court should grant summary judgment in its favor "because Duke has a license to practice the patents for

government research purposes pursuant to the Bayh–Dole Act." (Def.'s Statement on Course Future Proceedings at 6.) The Court notes that the Bayh–Dole Act, 35 U.S.C. §§ 200–212, states in pertinent part as follows:

(c) Each funding agreement with a small business firm or nonprofit organization shall contain appropriate provisions to effectuate the following:

. . . .

(4) With respect to any invention in which the contractor elects rights, the Federal agency shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world: Provided, That the funding agreement may provide for such additional rights, including the right to assign or have assigned foreign patent rights in the subject invention, as are determined by the agency as necessary for meeting the obligations of the United States under any treaty, international agreement, arrangement of cooperation, memorandum of understanding, or similar arrangement, including military agreement relating to weapons development and production.

35 U.S.C. § 202(c)(4).

As discussed above, although Duke has always asserted this defense, this Court did not rely upon this defense in its earlier decision granting summary judgment in favor of Duke University. The Court instead found Plaintiff's claims to be barred by the experimental use defense. The Court did state in its Summary Judgment Opinion, however, that

[i]n this case, the funding agreements for the inventions created under the '994 and '103 patents expressly provide that the Government retained rights in those inventions. Therefore, in light of the Bayh–Dole Act and said funding agreements, those uses that Defendant has made with respect to the '103 and '994 Patents that have been authorized by the Government do not constitute patent infringement to the extent that such uses are protected by an irrevocable government license.

*Madey*, 266 F.Supp.2d at 429 n. 3. The Court further noted that the parties had "presented conflicting evidence as to the extent to which the patented devices have been used for a purpose consented to by the Government . . . ."

On appeal, the Federal Circuit only briefly addressed Duke's argument that it is entitled to summary judgment because it is using the patents on behalf of the government. With respect to the government license defense, the Federal Circuit stated as follows:

Before this court, Duke argued vehemently that even if we did not agree with the district court's application of the experimental use defense that we could affirm the district court's judgment on alternate grounds: that the government had a license to have the patents at issue practiced on its behalf. We disagree with Duke's assertion because it overstates the information contained in the record on appeal. The only concrete evidence Duke cites is the statements on each of the patents noting that the government has rights in the patents. This, however, is insufficient because these short notations on the patents do not define the scope of the government's rights. None of the controlling contracts that would define the scope of such rights are provided in the record nor discussed by Duke in its arguments.

In addition, Duke discusses at length the Bayh–Dole Act, urging that this provides a basis to conclude that the scope

of the rights granted to the government encompass Duke's use. Madey, however, notes that the provisions cited by Duke were enacted into law after Madey's two patents issued. Thus, some other provision may have generated the "government rights" notation on the two patents. In sum, this discussion serves to illustrate that the government license issue needs further development before the district court if it is to ultimately provide Duke the defense it seeks.

*Madey*, 307 F.3d at 1363–64.

At the status conference this Court previously held, Duke's counsel seemed to agree with the Federal Circuit "that the government license issue needs further development before the district court if it is to ultimately provide Duke the defense it seeks." He stated that there are "holes" in the record and "that there are some uses that are not, quote, governmental uses . . . ." Counsel for Duke thus seemed to concede that currently the evidence in the record does not support full summary judgment in Duke's favor. (Status Conf. Tr. at 15.)

Giving the conflicting evidence presented by the parties, Duke has failed to establish its entitlement to the government license defense at this time. As such, based on the information presently before the Court, or the lack thereof, summary judgment for Defendant is denied.

b. Whether Further Development of the Government License Defense Would Be Appropriate Prior to Trial

The next question before the Court, therefore, is whether the Court should allow additional dispositive motions limited to further factual and legal development of the government license defense prior to trial. The Court finds that, after a careful review of the record before the Court, the arguments made by the parties, and the instructions the Federal Circuit provided

to this Court in its Opinion remanding this case, that further factual and legal development of the government license defense is appropriate before this case goes to trial. In particular, the Court notes that there are several underdeveloped issues surrounding the government license defense. First, although it is clear from the face of the patents that the government has some interest in these patents, the scope of that interest is unclear. As the Federal Circuit noted, the "short notations on the patents [stating that the government has an interest in these patents] do not define the scope of the government's rights. None of the controlling contracts that would define the scope of such rights are provided in the record nor discussed by Duke in its arguments." *Madey*, 307 F.3d at 1363–64. Second, with respect to Duke's position that the Bayh–Dole Act defines the scope of the government's rights in these patents, the Federal Circuit also noted Plaintiff's argument "that the provisions [of the Bayh–Dole Act] cited by Duke were enacted into law after Madey's two patents issued. Thus, some other provision may have generated the 'government rights' notation on the two patents." *Id.* This Court notes that there has been no briefing before this Court of the issue of the timing of the Bayh–Dole Act. Thus, in order for this Court to fulfill its mandate from the Federal Circuit to fully address these issues on remand, the Court finds that additional factual and legal development are necessary.

Accordingly, the Court will allow the parties to submit additional dispositive motions and briefs, including evidence and arguments as appropriate, on the viability of Duke's government license defense. In particular, the Court notes that in order to consider the availability of the defense, the following issues need clarification: (1) The scope of the government's rights in the patents based upon contract N00014–78–

C–0403 awarded by the Office of Naval Research (the '103 patent) and contract DAAL03–88–K0109 awarded by the U.S. Army Research Office (the '994 patent); (2) whether the government has rights in the patents under the Bayh–Dole Act, or whether the relevant provisions of the Bayh–Dole Act are inapplicable; (3) additional evidence documenting the extent to which Duke's use of the '103 and '994 patents was done on behalf of the government or whether Duke used the patents for other means; and (4) any additional arguments or evidence either party believes relevant to this Court's determination of the viability and scope of the government license defense. The Court will discuss, in the Order attached to this Memorandum Opinion, the briefing schedule the parties must adhere to with respect to any additional motions to be filed at this time with respect to this defense.*

### 3. 28 U.S.C. § 1498 Defense

Finally, Duke originally contended at the motion-to-dismiss stage that this Court lacked jurisdiction over all or a portion of Plaintiff's claims for infringement under the '103 patent based upon 28 U.S.C. § 1498. Section 1498 provides, in pertinent part, as follows:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a). Duke reasoned that because it was using the '103 patent "by or for the United States," Plaintiff's infringement claim should have been brought

against the United States Government in the United States Court of Federal Claims. In its Dismissal Opinion, this Court agreed with Defendant in part, holding as follows:

> [Duke's] motion is granted with respect to Plaintiff's infringement claims which are based upon allegations of patent use by Defendant Duke University pursuant to government research grants issued to the University. However, Defendant's motion is denied with respect to Defendant's alleged use of the patent for private purposes outside the scope of the government's retained right in the patent.

*Madey v. Duke Univ.*, No. 1:97CV1170, slip op. at 39 (M.D.N.C. Dec. 1, 1997).

The Federal Circuit reversed this decision, holding that, in lawsuits between private parties, § 1498 is not jurisdictional, but instead provides an affirmative defense to infringement. In reversing this Court's Dismissal Opinion, the Federal Circuit held that although a research grant (in this case, the ONR grant) could provide a basis for assertion of the § 1498 affirmative defense, the Federal Circuit found that in this case

> [t]he district court did not clearly identify, discuss or analyze the particular statements or aspects of the ONR grant that may have provided the government's authorization or consent to be sued. The court seems to have assumed that a research grant by a federal agency to a university for financial support of scientific research proposed by the university constitutes activity "for the United States" and provides authorization or consent by the United States for patent infringement liability for any patents used in the course of the research. In addition, the court did not discuss or characterize Duke's use or manufacture

* Editor's Note: Order is not included in this publication.

of the '103 patent embodiments as "by or for the United States."

*Madey*, 307 F.3d at 1359. Thus, the Federal Circuit instructed this Court as follows:

> [B]y failing to explain or demonstrate precisely how the ONR grant authorizes the government's consent to suit or authorizes Duke to use or manufacture the patented articles for the government, the district court has provided no findings or analysis upon which we can base our review of the issue appealed from the court's Dismissal Opinion. Although a research grant may not meet the requirements of § 1498(a), from the limited record presented by the parties, it cannot be determined whether the ONR grant may authorize the necessary predicates for § 1498(a). However, even if Duke ultimately prevails on its assertion of § 1498(a) as an affirmative defense for its use of the '103 patent under the ONR grant, that does not mean that the district court's dismissal of the claim was without error. *The ultimate factual and liability determinations are issues for the district court to determine initially on remand because in addition to evaluating the ONR grant and making the requisite findings, as it noted in its Dismissal Opinion, it has not yet determined which uses fall within the scope of the ONR grant and which uses are outside that scope.* This determination, as well, seems necessary to support the dismissal in-part.

*Id.* at 1360 (citation omitted) (emphasis added).

Thus, the Federal Circuit has instructed this Court to determine which uses of the '103 patent fall within the scope of the ONR grant and which uses do not. However, the record and arguments before the Court at this time are insufficient, for a number of reasons, for the Court to make this determination. First, because the Court originally ruled on the § 1498 defense at the motion-to-dismiss stage, Duke never had the opportunity to assert this affirmative defense at the summary judgment stage. Second, it is unclear to the Court whether and how the § 1498 defense is distinct from or complementary to Duke's government license defense. Although the Federal Circuit treated these two defenses separately, there seems to be factual and legal overlap between these defenses that has not been adequately addressed by the parties. Notably, Duke did not even mention § 1498 at the status conference or in its post-status conference memorandum to the Court. It is thus unclear to the Court whether Duke seeks to independently pursue the § 1498 defense or whether Duke's § 1498 arguments are subsumed within its assertion of the government license defense.

Accordingly, as the Court did with the government license defense, the Court will allow the parties to file additional dispositive motions related to the § 1498 defense prior to trial. Specifically, the Court will allow the parties to address and develop the following issues (as well as any other issues related to this defense that the parties deem appropriate): (1) whether Defendant is still asserting this defense; (2) whether and how the § 1498 defense is related to or subsumed by the government license defense; (3) how the ONR grant authorizes the government's consent to suit or authorizes Duke to use or manufacture the patented articles for the government, and (4) which uses fall within the scope of the ONR grant such that they could be protected by a § 1498 defense and which uses are outside that scope. The Court will discuss, in the Order attached to this Memorandum Opinion, the briefing schedule the parties must adhere to with respect to any motions related to the § 1498 defense.

## C. State Law Motion

■ In addition to Plaintiff's claims for patent infringement, Plaintiff also asserts several state-law claims against Duke: conversion of property (and purportedly, perhaps, a somewhat related claim of misappropriation of business opportunities) (third claim), constructive fraud (sixth claim), and breach of contract (seventh claim). In its Dismissal Opinion, this Court held that Plaintiff had adequately stated each of these claims in accordance with Federal Rule of Civil Procedure 8. Accordingly, the Court denied Defendant's Rule 12(b)(6) Motion to Dismiss these claims. *Madey,* No. 1:97CV1170, slip op. at 38–40. After the completion of discovery, Duke moved for summary judgment on each of Plaintiff's state-law claims in accordance with Rule 56. However, because the Court granted summary judgment on both of Plaintiff's patent claims, the Court, in its discretion pursuant to 28 U.S.C. § 1367(c)(3), declined to exercise supplemental jurisdiction over Plaintiff's related state law claims. As discussed more fully above, however, the Federal Circuit reversed this Court's grant of summary judgment with respect to Plaintiff's federal claims, finding that the Court improperly applied the experimental use defense in dismissing Plaintiff's patent claims. As such, the Federal Circuit specifically held that "[o]n remand, given our reversal of the district court's application of the experimental use defense, these [state law] claims are still initially available to Madey." *Madey,* 307 F.3d at 1364. As this Court has discussed above, the Court now holds, consistent with the Opinion of the Federal Circuit, that Defendant is not entitled to summary judgment based upon the experimental use defense. The Court has also found that, at least at this stage of the proceedings, Defendant is not entitled to summary judgment with respect to Defendant's government license defense and its § 1498 defense. Accordingly, the Court has found that dismissal of Plaintiff's patent claims is improper at this time. Thus, because Plaintiff's federal claims have not been dismissed, the Court finds it appropriate to now address Plaintiff's state-law claims on the merits.[3] The Court will therefore now determine whether Defendant is entitled to summary judgment on any or all of Plaintiff's state-law claims.

### 1. Conversion and Misappropriation of Business Opportunities (Third Claim)

In Plaintiff's third claim, Plaintiff asserts state-law claims for conversion of property and misappropriation of business opportunities. The Court will discuss these claims in turn.

### a. Conversion

■ Plaintiff's first state-law claim (third claim) is for conversion. In his Amended Complaint, Plaintiff alleges that "[t]hrough their unauthorized actions, Duke . . . . wrongfully converted the property of Dr. Madey—including the Mark III

---

**3.** Defendant contends that Plaintiff's state law claims are barred by the statute of limitations because Plaintiff should have re-filed his state law claims within 30 days of their dismissal by this Court in its ruling on summary judgment with respect to the federal claims. However, this Court did not dismiss the state law claims on the merits, but simply declined to exercise supplemental jurisdiction over those claims after the federal claims were dismissed. When the Federal Circuit reversed this Court's dismissal of the federal claims, the Federal Circuit noted that "given our reversal of the district court's application of the experimental use defense, these [state law] claims are still initially available to Madey." *Madey,* 307 F.3d at 1364. Under these circumstances, this Court rejects Defendant's contention that Plaintiff's state law claims are now barred by the statute of limitations.

FEL and related equipment—to their own use and benefit and have deprived Dr. Madey of the ownership, use, enjoyment, and benefit of the property." (Am. Compl.¶ 101.) As this Court previously held in its Dismissal Opinion, "[u]nder North Carolina law, conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Madey,* No. 1:97CV1170, slip op. at 15 (some internal quotations omitted) (quoting *Peed v. Burleson's Inc.,* 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). However, this Court has consistently held that " 'this definition clearly does not provide an independent standard for determining whether conversion occurred, for what constitutes an "unauthorized" interference with another's ownership of goods or chattels depends upon the circumstances under which such interference arose.' " *Id.* (quoting *Binkley v. Loughran,* 714 F.Supp. 776, 779 (M.D.N.C.1989)).

Defendant proffers two reasons why it is entitled to summary judgment on Plaintiff's claim for conversion: (1) the Mark III FEL and its related equipment are not Dr. Madey's property and (2) even if Plaintiff does have ownership rights in the Mark III FEL, Duke did not *wrongfully* possess the Mark III FEL. The Court will discuss these contentions in turn.

#### (1) Dr. Madey Does Not Own the Mark III FEL and Its Related Equipment

■ Duke first contends that the Mark III FEL and its related equipment are not Dr. Madey's property, but instead "Duke owns the Mark III and related equipment that came from Stanford because Stanford and the government conveyed title to Duke." (Def.'s Mem. Supp. State Law Mot. [Doc. # 63] at 10.) Plaintiff, however, supports his contention that he has ownership rights in the Mark III FEL based upon the following logic: (1) he provided funding for the initial construction of the Mark III FEL by giving money to Stanford; (2) this money was given to Stanford with the understanding that Stanford would give Plaintiff control and use of the Mark III FEL; (3) Stanford did in fact expend this money in the initial construction of the Mark III FEL; and (4) therefore, Plaintiff has ownership rights in the Mark III FEL. Duke contends, however, that any money that Plaintiff gave Stanford constituted a gift and did not vest in Plaintiff any ownership rights in the Mark III FEL. However, Plaintiff offers the affidavit of C. Frederick Bentley, II, who was the Director of the Sponsored Projects Office at Stanford during the time that Dr. Madey was a professor at Stanford. In his affidavit, Mr. Bentley states, in pertinent part, the following:

3. I was at Stanford during the period that Dr. Madey designed and constructed the Mark III FEL. As indicated by correspondence between Dr. Madey and various government officials, particularly Dr. Bob Guenther of the Army Research Office, Dr. Madey had been seeking government funding for construction of the Mark III FEL for a significant period of time without success when he decided to begin the initial construction with his own funds. The major expense for the construction was the cost of labor for design and fabrication of the equipment. Any government funds received for that purpose would have been subject to the normal indirect cost deductions by Stanford for administration and overhead. However, Stanford and Dr. Madey agreed that Dr. Madey could supply the necessary funds to pay the lab personnel and no indirect costs would be imposed on those funds. Dr. Madey agreed to provide the funds with the agreement and understanding, which Stanford accepted, that the funds would be used

solely to support Dr. Madey's research program and Dr. Madey would have the right to control and direct the use of the Mark III FEL and the right to use it for his research. A "gift" account was established and the funds contributed by Dr. Madey were allocated to that account and were spent under his direction and supervision.

(Bently Aff. [Document # 75] ¶ 3.)

In response to this evidence, Duke continues to argue that Dr. Madey merely made charitable gifts to Stanford and he had no control over those proceeds. However, Mr. Bentley's statement that "the funds contributed by Dr. Madey were ... spent under his direction and supervision," *id.,* disputes Duke's assertion. Duke further argues, however, that even if Dr. Madey did supervise the construction of the Mark III FEL, "he was acting as an agent of Stanford and not on his own behalf" and therefore he did not obtain any ownership rights in the Mark III FEL. (Def.'s Mem. Supp. State Law Mot. at 5 n. 6.) In support of this argument, Duke cites *Connelly v. Bank of America National Trust & Savings Ass'n,* 138 Cal.App.2d 303, 291 P.2d 501 (1956), in which the California District Court of Appeal[4] specifically held that

> a donor may retain custody and control over the subject of the gift where such possession and control relates [sic] only to the use and enjoyment thereof and does not vest in the donor any interest or title in the property itself, and that where such custody and control is to be exercised by the donor as agent of the donee, all other essentials of a completed gift existing, the gift is not to be affected or invalidated.

*Id.* at 503. The Court further noted that the essentials of a completed gift are (1) competency of the donor to contract, (2)

a voluntary intent on the part of the donor to make a gift, (3) delivery, either actual or symbolical, amounting to a transfer of title, (4) acceptance, actual or imputed, (5) a complete divestment of all control by donor, (6) a lack of consideration in return for the gift.

*Id.*

The case before this Court, however, is distinguishable from *Connelly.* First, Plaintiff's evidence shows a genuine issue with respect to whether he completely divested all control over the money he transferred to Stanford. Second, Plaintiff's evidence also shows that he received consideration in return for transferring the money to Stanford, that is, in return for transferring the money to Stanford, Plaintiff received the right to control how the funds were spent as well as the right to use the Mark III FEL in his research. Third, there is a genuine issue in this case whether Plaintiff was Stanford's agent with respect to his construction and use of the Mark III FEL. For all of these reasons, therefore, the standards articulated in *Connelly* do not support summary disposition of this claim at this time.

In further support of its argument that Plaintiff has no rights of ownership in the Mark III FEL, Defendant also contends that

> the evidence in this case conclusively establishes that Duke is the true owner of this equipment. It is undisputed that after the Army funded additional development of the Mark III, the Government and Stanford agreed, through a 1996 Settlement Agreement, to convey title to Duke for *all equipment* that was transferred from Stanford to Duke through the Air Force."

---

**4.** The parties do not dispute that California law governs whether Plaintiff obtained an ownership interest in the Mark III FEL while he was at Stanford.

(Def.'s Mem. Supp. State Law Mot. at 5–6.)

Again, however, Mr. Bentley's affidavit disputes Duke's assertion that Stanford transferred title to the Mark III FEL to Duke. Mr. Bentley stated, in part pertinent, as follows:

> Stanford did not transfer title to the Mark III FEL or any part of the Mark III FEL to Duke.... It was at the request of Dr. Madey, and at the direction of the Army, that Stanford released the Mark III FEL for shipment to Duke. That action did not constitute a transfer of title to Duke by Stanford of the Mark III FEL.

(Bentley Aff. ¶ 7.) Mr. Bentley further explained in his affidavit that

> 9. After Dr. Madey left Stanford, a dispute developed between Stanford and the Air Force over amounts Stanford believed it was owed for work performed at Stanford under the Air Force–0012 contract....
>
> 10. After the claim had been pending for several years, I recommended that Stanford settle the dispute with the Air Force.... As part of these settlement negotiations, there was never any discussion of transferring title to Duke of the Mark III FEL or any property other than the property covered by the AF–0012 contract.

(*Id.* ¶¶ 9–10.)

The Court thus finds that the parties have presented conflicting evidence as to whether the Mark III FEL and its related equipment were "transferred from Stanford to Duke through the Air Force." (Def.'s Mem. Supp. State Law Mot. at 6.) At this stage of the proceedings, therefore, the Court finds that Plaintiff has demonstrated a genuine issue of material fact regarding whether he has an ownership interest in the Mark III FEL and related equipment. As such, Duke is not entitled to summary judgment on Plaintiff's conversion claim based upon its contention that Plaintiff does not own the Mark III FEL and related equipment.

**(2) Duke Did Not Wrongfully Possess the Mark III FEL and Its Related Equipment**

 Duke's second contention, however, is that it did not wrongfully possess the Mark III FEL and related equipment because it "had a reasonable belief that it owned this equipment since at least 1996." (Def.'s Mem. Supp. State Law Mot. at 10.) Duke thus contends, without any supporting authority, that the tort of conversion includes an element of *wrongful intent.* However, in North Carolina, while the tort of "[c]onversion necessarily involves an intentional act, ... the intention need not be wrongful ...." *Marlen C. Robb & Son Boatyard & Marina, Inc. v. VESSEL BRISTOL,* 893 F.Supp. 526, 543 (E.D.N.C. 1994); *see also* Restatement (Second) of Torts § 224 cmt. c (1965) (stating that "the defendant may be liable for conversion where he has in fact exercised dominion or control, although he may be quite unaware of the existence of the rights with which he interferes"). In addition, under North Carolina law, even if a Defendant rightfully comes into possession of the goods, a conversion occurs when the rightful owner demands return of the goods and the Defendant refuses. *Hoch v. Young,* 63 N.C.App. 480, 483, 305 S.E.2d 201, 203 (1983). The evidence is undisputed that Duke intentionally exercised dominion and control over the Mark III FEL and related equipment and refused to turn the equipment over to Plaintiff upon his request. As such, Duke's second contention fails as a matter of law. In summary, therefore, Plaintiff has demonstrated a genuine issue of material fact on his claim for conversion. As such, Defendant's Motion for Summary Judgment on this claim is denied.

#### b. Misappropriation of Business Opportunities

■ Plaintiff's conversion claim also includes allegations regarding a purported claim identified as a claim for "misappropriation of business opportunities." In Defendant's Motion for Summary Judgment, Defendant contends that the claim for "misappropriation of business opportunities" should be dismissed because such claims are only recognized in the corporate and partnership contexts. North Carolina courts have recognized claims for usurpation or misappropriation of a business opportunity, but only against corporate officers or partners who usurp a business opportunity that rightfully belongs to the corporation or partnership. *See Meiselman v. Meiselman,* 309 N.C. 279, 307, 307 S.E.2d 551, 567 (1983); *Boyd v. Howard,* 147 N.C.App. 491, 494, 556 S.E.2d 337, 339 (2001). Plaintiff has not presented any evidence or allegation to establish that such a claim is available to him as a separate claim based on the circumstances of this case. However, it appears that this "claim" is actually discussed as a part of Plaintiff's claim for conversion and breach of fiduciary duty, rather than Plaintiff asserting it as a separate legal claim. In this Court's Dismissal Opinion, the Court reviewed North Carolina law on fiduciary relationships, and concluded that Plaintiff had sufficiently alleged the existence of a fiduciary relationship which might have provided a basis for a misappropriation of business opportunity claim. For that reason, the Court also allowed Plaintiff the opportunity to further develop the claim for "misappropriation of business opportunity." However, based on a further review of the pleadings and briefs submitted on this issue, it now appears that Plaintiff's civil action is actually a claim for damages stemming from the alleged conversion and for breach of fiduciary duty, rather than an attempt by Plaintiff to assert a claim based upon usurpation of a corporate opportunity by Defendant. Therefore, to the extent that Plaintiff offers these allegations of misappropriation of business opportunities solely as part of the discussion of his claim for conversion and breach of fiduciary duty, Plaintiff has presented a genuine issue of material fact as to those claims, as discussed herein, and Defendant is not entitled to summary judgment with respect to Plaintiff's claims for conversion and breach of fiduciary duty. However, for the reason stated, Plaintiff would not have a basis for asserting a stand-alone claim against Defendant for misappropriation or usurpation of business opportunities.

#### 2. Constructive Fraud (Sixth Claim)

■ Plaintiff's sixth claim is for constructive fraud. As this Court previously held in its Dismissal Opinion, to prevail on a claim for constructive fraud a plaintiff must show a "(1) relation of trust and confidence ... (2) (which) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Madey v. Duke Univ.,* No. 1:97CV1170, slip op. at 32 (alteration in original) (quoting *Terry v. Terry,* 302 N.C. 77, 85, 273 S.E.2d 674, 678–79 (1981) (quoting *Rhodes v. Jones,* 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950))). In *Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997), the North Carolina Court of Appeals explained the tort of constructive fraud as follows:

> Constructive fraud differs from actual fraud in that "it is based on a confidential relationship rather than a specific misrepresentation." *Terry v. Terry,* 302 N.C. 77, 85, 273 S.E.2d 674, 678–79 (1981). Implicit in the requirement that a defendant "[take] advantage of his position of trust to the hurt of plaintiff" is the notion that the defendant must seek

his own advantage in the transaction; that is, the defendant must seek to benefit himself.

*Id.*

Defendant contends that it is entitled to summary judgment on Plaintiff's constructive fraud claim for two primary reasons. First, Defendant contends that it was not in a fiduciary relationship with Plaintiff. However, this Court considered that argument at length in its Dismissal Opinion, and concluded that a fiduciary relationship could exist between Plaintiff and Defendant under North Carolina law if sufficient evidence were presented on that issue. Defendant has not presented any additional arguments on this point, and the Court concludes that a genuine issue of fact exists as to the nature of the relationship between Plaintiff and Defendant.

In addition, Duke contends that "Madey's complaint does not allege, and the record does not indicate, any benefit sought by or accruing to Duke based on its supposedly fraudulent actions." However, Plaintiff has proffered sufficient evidence to demonstrate a genuine issue of material fact as to whether Duke breached its fiduciary duty towards Plaintiff in order to gain control of the Mark III FEL and Plaintiff's research program. Such control would obviously be of great benefit to Duke as a major research university. As such, Defendant's State Law Motion for summary judgment on Plaintiff's sixth claim is denied.

### 3. Breach of Contract (Seventh Claim)

Plaintiff's final state-law claim is for breach of contract. Plaintiff claims that when he relocated his Mark III FEL lab to Duke, he and Duke entered into a Research Agreement that defined the contractual relationship between him and Duke. In his Amended Complaint, Plaintiff specifically stated the provisions of this contract:

16. The terms of the Research Agreement include the following:

a. Dr. Madey would join the faculty of the Department of Physics as a Professor with tenure and would receive all the rights, benefits, and process due a tenured faculty member of Duke as outlined in the Duke University Faculty Handbook, which is expressly incorporated herein by reference for all purposes, specifically including the promise of academic freedom and the due process rights afforded tenured faculty members at Duke;

b. Dr. Madey would bring his expertise, his research projects, his Mark III and related equipment, and his patents to Duke for his use and the use of others at Duke who would be subject to Dr. Madey's control and supervision;

c. All use and operation of the Mark III and related equipment, and any other equipment covered by the '103 Patent would be supervised and directed by Dr. Madey;

d. All research at Duke that relies on the principles and methods described in the '994 Patent would be supervised and directed by Dr. Madey;

e. Dr. Madey would assist Duke in obtaining research grants and contracts for the research to be conducted by Dr. Madey, for which Dr. Madey would be the principal investigator;

f. Dr. Madey would be permitted to pursue research of interest to him using the equipment and facilities of the Duke FEL Lab and Dr. Madey would become director of the Duke FEL lab;

g. Duke would provide a research facility to house Dr. Madey's Mark

III and other necessary equipment, where Dr. Madey would be allowed to conduct and direct his research;

h. Duke would support and foster research by other faculty to work in "collaboration" with Dr. Madey; and

i. Duke would preserve and nurture the intellectual accomplishments of Dr. Madey and his colleagues and would maintain the policies, organization and resources needed to ensure the success of the Duke FEL lab's mission.

(Am.Compl.¶ 16.) Plaintiff further supports his contention that a Research Agreement existed between him and Duke by reference to his deposition testimony. (Madey Dep. Vol. II [Doc. # 80] at 62–81.)

Duke contends, however, that it is entitled to summary judgment on Plaintiff's claim for breach of contract for two primary reasons. First, Duke contends that Plaintiff has offered no admissible evidence that Duke entered into a Research Agreement with Plaintiff. Second, Duke argues that even if there was such a Research Agreement between Duke and Plaintiff, it did not breach that agreement. The Court will discuss Duke's contentions in turn.

a. Whether Plaintiff Demonstrates a Genuine Issue that a Research Agreement Existed Between Him and Duke

Defendant first contends that it did not enter into any such Research Agreement with Plaintiff. In support of this assertion, Defendant argues that the only promises Duke made to Plaintiff were to appoint him as a tenured professor and to build a facility to house his research. In support of this argument, Defendant cites three letters from Duke to Plaintiff. (Letter from Richard A. White, Professor and Dean of Duke Univ., to Madey of 2/23/88

(Def.'s Ex. 38) [Doc. # 64] (hereinafter the "White II Letter"); Letter from Richard A. White, Professor and Dean of Duke Univ., to Madey of 1/20/88 (Def.'s Ex. 14) [Doc. # 64] (hereinafter the "White I Letter"); Letter from Phillip A. Griffiths, Provost of Duke Univ., to Madey of 11/13/88 (Def.'s Ex. 39) (hereinafter "Griffiths Letter").)

Duke contends that these three letters constitute a complete integration of Dr. Madey's employment contract with Duke and therefore any parol evidence of additional contractual terms between Dr. Madey and Duke is inadmissible. Dr. Madey contends, however, that these writings are not the full integration of the terms of the Research Agreement and therefore the additional terms of the Research Agreement may be shown by parol evidence.

As this Court previously held in *Cananwill, Inc. v. EMAR Group, Inc.*, 250 B.R. 533 (M.D.N.C.1999), to determine whether the parol evidence rule is applicable, the Court must first determine if the writing or writings were "integrated." *Smith v. Central Soya of Athens, Inc.*, 604 F.Supp. 518, 524 (E.D.N.C.1985). Only findings of integration will implicate the parol evidence rule, which provides as follows:

> Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superceded and made legally ineffective by the writing. The execution of the final writing may be termed the "integration" of the transaction. By it all prior and contemporaneous negotiations or agreements, whether oral or written, are "merged" into the writing, which thus becomes the exclusive source of the parties' rights and obligations with respect to the particular transaction or part thereof intended to be covered by it.

*Id.* (internal quotation marks omitted) (emphasis omitted) (quoting 2 Brandis on

North Carolina Evidence § 251 (1982)); *accord Craig v. Kessing,* 297 N.C. 32, 34–35, 253 S.E.2d 264, 265–66 (1979).

The application of the parol evidence rule further depends, however, on whether the integration was "partial" or "total." *Smith,* 604 F.Supp. at 524; *Craig,* 297 N.C. at 35, 253 S.E.2d at 265–66. Therefore, after determining whether there was an integration, the Court must next determine whether that integration was a *total* integration. If this Court finds that the letters sent to Plaintiff were a total or complete integration, then "evidence of prior and contemporaneous negotiations and agreements are not admissible to vary, add to, or contradict the writing." *Smith,* 604 F.Supp. at 524 (citing *Rowe v. Rowe,* 305 N.C. 177, 185, 287 S.E.2d 840, 845 (1982)). If, however, these letters are determined to be only a partial integration of the agreement between Plaintiff and Duke, then "not only may prior or contemporaneous evidence be admitted to clarify any ambiguity, but evidence of consistent additional terms may also be introduced and incorporated into the writing by means of parol evidence." *Id.* (citing *Hoots v. Calaway,* 282 N.C. 477, 193 S.E.2d 709 (1973); *A & A Discount Ctr., Inc. v. Sawyer,* 27 N.C.App. 528, 219 S.E.2d 532 (1975)).

Following these rules, this Court must initially determine "whether the relevant writings [the three letters] were intended by the parties as final expressions or integrations of the terms contained therein, i.e. did the parties intend the writings to evidence their final agreement with regard to the included terms in the contracts." *Id.* To make this determination, the Court must of course look at the actual letters themselves. In the first letter (the "Griffiths Letter"), Duke University Provost Phillip A. Griffiths wrote to Dr. Madey to inform him that Duke was prepared to offer him a position on Duke's faculty and that Duke would construct a building to house his Mark III FEL and related equipment. The last paragraph of the letter stated, in pertinent part, as follows:

> As the plans and needs of you and your sponsors become clearer, the plans for the building, collaborations with faculty at Duke and other area universities, and the long term development of the facility can be made more specific. If there are matters that you feel should be clarified before you can make your decision, please let me know.

(Griffiths Letter at 2.)

The second letter (the White I Letter") was written by Duke Professor and Dean Richard A. White. This letter states that Dr. Madey would be appointed as a tenured professor with Duke, that he would earn an initial salary of $75,000 per nine months, and that Duke would reimburse Dr. Madey's moving expenses up to $5000. The letter further states that "[w]e understand that your acceptance of these terms is contingent on your acceptance of details concerning your space requirements that will be set forth in a separate letter from Charles Putnam, Vice–Provost." (White I Letter.) This letter was dated January 14, 1988, and Dr. Madey signed the letter accepting the position with Duke on January 15, 1988.

The third letter (White II Letter) states, in its first paragraph, as follows: "In conjunction with our offer to you of an appointment as Professor of Physics at Duke University, we detail in this letter our understanding of the arrangements you will require with respect to space to house your research projects." (White II Letter.) The letter then proceeds to describe the facility that would be constructed to house the Mark III FEL and related equipment. The letter closes with the following paragraph: "I hope that these arrangements are satisfactory to you. If so, please indicate your agreement by signing one copy of this letter and returning it to

me as soon as possible. Your agreement will complete the acceptance of our offer of a position as Professor of Physics." (*Id.*) The letter, dated February 23, 1988, was signed by Dr. Madey on March 1, 1988.

Based on a thorough review of these letters, the arguments of the parties, and the other relevant evidence before the Court, the Court finds that these three letters were adopted as an integrated agreement. In fact, Dr. Madey does not dispute that the terms contained in these letters, that is, his appointment as a tenured professor, his salary, the reimbursement of his moving expenses, and the arrangements with respect to the Mark III FEL lab, were the contractual terms to which he agreed.

Having determined that these letters constitute an integrated agreement, the Court must now determine whether these letters were a *total* integration of the employment contract between Dr. Madey and Duke University. As the Eastern District of North Carolina thoroughly explained in *Smith v. Central Soya of Athens, Inc.*, 604 F.Supp. 518 (E.D.N.C.1985), there are four general tests espoused by commentators and employed by courts for making this determination. The court in *Smith*, however, found that "the North Carolina courts have formulated their own standard, seemingly combining elements of all four" approaches. The court found controlling the standard articulated by the North Carolina Supreme Court in *Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953):

> [W]here the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing. Accordingly, all prior and contemporaneous negotiations in respect to those elements are

deemed merged in the written agreement.

*Smith*, 604 F.Supp. at 525 (internal quotation marks omitted) (quoting *Neal*, 239 N.C. at 77, 79 S.E.2d at 242). In analyzing this language from *Neal*, the court in *Smith* noted that

> [t]his approach reflects the view that situations will often arise in which the writing, on its face, clearly embodies the sum total of the parties' agreement. In these instances, further inquiry beyond the terms of the contract is not required. By the same token, when the terms of the writing are not so definitive, then implicitly, the court must view the surrounding circumstances to ascertain the intent of the parties with regard to whether the writing was meant to be a total integration.

*Id.*

Duke contends that the closing sentence of the White II Letter, which states that Dr. Madey's "agreement will complete the acceptance of [Duke's] offer of a position as Professor of Physics," demonstrates that these letters clearly embody the full agreement between Dr. Madey and Duke. Duke thus contends that this language operates as a "merger clause," that is, a provision stating that the letters contain the full agreement between the parties. As the *Smith* court held, in North Carolina,

> [t]he existence of a merger clause generally provides unambiguous and unassailable evidence of the parties' intent with reference to the terms of the contract. It clearly precludes a court from admitting extrinsic evidence on a theory that the writing was not a final expression. It further creates a rebuttable presumption that the writing is a complete and exclusive statement of the contract terms. In order to rebut the presumption and, in effect, invalidate the merger

clause, a party must offer evidence to establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact.

*Smith,* 604 F.Supp. at 526 (citations omitted).

■ The Court finds, however, that the provision in the White II Letter cited by Defendant does not constitute a merger clause. A typical merger clause, such as the one found dispositive in *Tar River Cable TV. Inc. v. Standard Theatre Supply Co.,* 62 N.C.App. 61, 302 S.E.2d 458 (1983), states something akin to the following: "This instrument constitutes the entire agreement between the parties for the sale of the goods, and no oral agreements or representations of any nature or kind shall be binding." *Id.* at 65, 302 S.E.2d at 460 (internal quotations omitted). The final sentence in the White II Letter merely indicates that signing the letter is the last formal step necessary for Dr. Madey to join Duke as a Professor of Physics. It makes no mention of excluding other agreements or representations, nor does it state that Dr. Madey's signing of the White I and White II letters represented the entire agreement between Dr. Madey and Duke. In summary, therefore, Duke assertion that the White II Letter contains a merger agreement fails.

■ Of course, even absent a merger agreement, the Court can still consider the question of whether these letters are a complete integration of the terms of the contract between Dr. Madey and Duke. The Court, however, finds that they are not a complete integration. The Court notes that the Griffiths Letter states that "[a]s the plans and needs of you and your sponsors become clearer, the plans for … collaborations with faculty at Duke and other area universities … and the long term development of the facility can be made more specific," but neither of the subsequent letters mentions these provisions. The Court finds that the circumstances surrounding Plaintiff's signing of the White I and White II Letters shows that they are not a full integration of the agreement between Duke and Dr. Madey.

■ Accordingly, because the Court finds that these letters do not constitute a complete integration of the contract between Plaintiff and Duke, Plaintiff may introduce parol evidence to prove "terms not included in the writing." *Vestal v. Vestal,* 49 N.C.App. 263, 266, 271 S.E.2d 306, 308 (1980). Defendant contends, however, that Plaintiff has offered no such evidence. Plaintiff contends that his evidence includes the allegations in his Amended Complaint (reproduced in pertinent part above) and his deposition testimony. Defendant replies, however, that in opposing a motion for summary judgment, Plaintiff may not merely rely on the allegations in his Amended Complaint. The Court notes that the general rule is that when one party moves for summary judgment, the nonmoving party cannot merely rely on the allegations of his complaint, but instead is required, by factual affidavit or the like, to respond to the motion. *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Kipps v. Ewell,* 538 F.2d 564, 566 (4th Cir.1976); Fed.R.Civ.P. 56(e)). However, when a Plaintiff files a *verified* complaint, the complaint functions as an opposing affidavit for summary judgment purposes, so long as the allegations contained in the complaint are based upon personal knowledge. *Id.*

In this case, Plaintiff filed a verified Amended Complaint. Attached to the Complaint is a notarized certificate signed by Plaintiff in which Plaintiff swears that the Complaint "is true of my own knowledge except as to those matters and things herein stated upon information and belief,

and as to those I believe them to be true." (Am. Compl. at 33.) The Court notes, however, that in *Walker v. Tyler County Comm'n*, 11 Fed.Appx. 270 (4th Cir.2001), the Fourth Circuit Court of Appeals reiterated the rule that in order to function as an affidavit for the purposes of summary judgment, it must be clear that the verified complaint is based on personal knowledge, not merely information and belief. In *Walker*, the Court found a verified complaint not to be based on personal knowledge where the certificate attached to the complaint contained language virtually identical to that contained in the certificate attached to Plaintiff's Amended Complaint. In affirming summary judgment for the defendant, the court of appeals reasoned as follows:

> The factual allegations in the complaint do not indicate which, if any, are based on personal knowledge [, as opposed to information and belief]. Because we cannot determine that the Walkers' allegation ... is based on Jack Walker's personal knowledge, their verified complaint cannot be considered the equivalent of an opposing affidavit.

*Id.* at 274.

In the present case, however, it is clear to the Court that the allegations contained in paragraph 16 of Plaintiff's Amended Complaint are based upon personal knowledge. Defendant vigorously disputes the validity of these allegations. However, it does not (and cannot) contend that Plaintiff's statements regarding the agreement he had with Duke are not within Plaintiff's personal knowledge because Plaintiff himself negotiated his employment agreement with Duke. Plaintiff's deposition testimony provides further support for these contentions regarding the Agreement, as well as support for the fact that Plaintiff's statements in paragraph 16 of the verified Amended Complaint are based on personal knowledge. Accordingly, the Court finds that paragraph 16 of Plaintiff's verified

Amended Complaint, as well as Plaintiff's deposition testimony, constitute evidence to which this Court can look in determining whether Plaintiff has demonstrated a genuine issue of material fact with respect to his breach-of-contract claim. As such, based upon Plaintiff's evidence, the Court finds that Plaintiff has demonstrated a genuine issue of material fact that a Research Agreement existed between Plaintiff and Duke. The Court will now determine whether Plaintiff has demonstrated a genuine issue of material fact that Duke breached that Research Agreement.

b. Whether Plaintiff Demonstrates a Genuine Issue of Material Fact that Duke Breached the Research Agreement

■ As this Court stated in its Dismissal Opinion, Plaintiff claimed in his Amended Complaint that Defendant breached the Research Agreement in three respects. First, Plaintiff claimed that Defendant's actions in removing Plaintiff from his position as Director of the FEL Lab and Principal Investigator of the ONR Grant are a violation of Defendant's agreement with Plaintiff. (Am. Compl. ¶ 130.) Second, Plaintiff claimed that Defendant's actions denying Plaintiff access to and control of the Mark III FEL equipment are a violation of the Research Agreement. (*Id.*) Third, Plaintiff claimed that the due process rights accorded to faculty members in decisions affecting their status and employment at Duke were incorporated into the Research Agreement, and Defendant's action in depriving Plaintiff of those rights constitutes a violation of the Agreement. (*Id.* ¶ 131.) In his Memorandum of Law in Opposition to Duke's Motion for Summary Judgment [Document # 82], however, Plaintiff does not discuss his second and third contentions; as such, the Court will only address Plaintiff's first contention, that is, Plain-

tiff's contention that Defendant breached the Research Agreement (1) by removing him from his position as Director of the FEL Lab and (2) by removing him as Principal Investigator of the ONR Grant.

Defendant contends it had the right to remove Dr. Madey from both positions. With respect to Dr. Madey's removal as Director of the FEL Lab, Duke contends (and Dr. Madey agrees) that Dr. Madey's position as Lab Director was not tenured. (Madey Dep. Vol. 1 at 93.) Duke further contends that Dr. Madey "has produced no evidence that Duke promised that he would be Lab Director forever or that he would hold this position despite the university's judgment that he was doing a poor job administratively." (Def.'s Mem. Supp. State Law Motion. at 16–17.) However, in his verified Amended Complaint, Plaintiff contends that pursuant to his alleged Research Agreement with Defendant, the parties agreed that Dr. Madey would bring his expertise, his research projects, his Mark III and related equipment, and his patents to Duke for his use and the use of others at Duke who would be subject to Dr. Madey's control and supervision; all use and operation of the Mark III and related equipment, and any other equipment covered by the '103 Patent would be supervised and directed by Dr. Madey; all research at Duke that relies on the principles and methods described in the '994 Patent would be supervised and directed by Dr. Madey; and Dr. Madey would be permitted to pursue research of interest to him using the equipment and facilities of the Duke FEL Lab, and that he would serve as director of the Duke FEL lab. (Am.Compl.¶ 16.) In its Dismissal Opinion, this Court has already held that the alleged provision in the Research Agreement "guarantee[ing] that Plaintiff would control the activities of the FEL Lab and the equipment which Plaintiff brought to the University for use in the Lab" was enforceable under North Carolina law.

*Madey*, No. 1:97CV1170, slip op. at 38. Therefore, this Court finds that Plaintiff has raised genuine issues of material fact as to the terms of the alleged agreement with Plaintiff regarding Plaintiff's role in directing the FEL Lab and the use of the equipment he brought with him to Duke, and as to whether Duke breached its alleged research agreement by removing Plaintiff as Director of the FEL Lab.

Defendant further contends that Duke breached the Research Agreement by removing him as Principal Investigator of the ONR Grant. Defendant argues that Plaintiff has failed to present any evidence showing that Duke was contractually obligated not to remove Plaintiff as the Principal Investigator on the ONR Grant. However, in the verified Amended Complaint, Plaintiff contends that the parties agreed that Dr. Madey would assist Duke in obtaining research grants and contracts for the research to be conducted by Dr. Madey, "for which Dr. Madey would be the principal investigator." (Am.Compl.¶ 16.) Dr. Madey also offers expert testimony establishing the customs and practices with respect to the performance of scientific research under contracts or grants from the federal government. (*See* Aff. of George A. Neece ("Neece Aff.") [Doc. # 77]; Aff. of M.J. Soileau ("Soileau Aff.") [Doc. # 76].) The testimony, if believed by a jury, would show that

[a] change in the Principal Investigator normally occurs only if the Principal Investigator becomes unavailable for some reason, through death, illness, transfer to another institution or similar circumstance.... An involuntary change by a University ... would be appropriate only where the research called for in the contract was not being successfully completed by the Principal Investigator."

(Soileau Aff. ¶¶ 5–6.)

Defendant responds, however, that this expert testimony is inadmissible parol evi-

dence and, even if admissible, is irrelevant. Plaintiff contends, however, that this expert opinion testimony can be introduced as evidence of the intentions of the parties in agreeing to the Research Agreement. The Court finds that such evidence is admissible and relevant. *See Dockery v. Quality Plastic Custom Molding, Inc.,* 144 N.C.App. 419, 422, 547 S.E.2d 850, 852–53 (2001) (allowing evidence of custom and usage to assist the jury in determining the meaning of an employment contract). Furthermore, the Court finds that Plaintiff has proffered sufficient evidence to demonstrate a genuine issue of material fact as to the terms of the alleged Research Agreement between him and Duke and the conditions under which he could be removed as Principal Director on the ONR Grant.

In summary, therefore, the Court finds, at this stage of the proceedings, that Plaintiff has demonstrated a genuine issue of material fact with respect to his claim for breach of contract. The Court does note, however, that Plaintiff's evidence is based heavily upon his own testimony, and obviously Plaintiff's ability to prove breach of contract at trial will likely be determined, at least in part, by the jury's assessment of Plaintiff's credibility. As such, this Court finds it appropriate to deny summary judgment in this matter and allow Plaintiff's claim for breach of contract to go to trial.

4. Conclusion with Respect to Defendant's State Law Motion

In conclusion, therefore, the Court finds that Plaintiff has demonstrated genuine issues of material fact with respect to each of his claims under North Carolina law, although, as discussed in detail above, the Court has determined that Plaintiff's pleadings and evidence support a claim for damages stemming from the alleged conversion and for breach of fiduciary duty, but not a separate claim for usurpation of a corporate opportunity by Defendant. As such, Defendant's Motion for Summary Judgment on the state law claims (the State Law Motion) is denied. Furthermore, the Court finds it unnecessary at this time to allow additional dispositive motions or evidence regarding Plaintiff's state-law claims.

## V. CONCLUSION AND FURTHER PROCEEDINGS

For the foregoing reasons, therefore, Defendant's Partial Motions for Summary Judgment [Documents # 63, # 65] are denied. However, consistent with the Court's discussion in Sections III.B.2.b and III.B.3 of this Memorandum Opinion, the Court will allow the parties to file additional dispositive motions with respect to the government license and 28 U.S.C. § 1498 defenses in light of the Federal Circuit's opinion and this Court's current Memorandum Opinion. The Court will outline the timetable for these motions in the attached Order.

In addition, the Court will allow the parties an additional forty-five days to supplement their discovery responses and pretrial disclosures. After the Court rules on any dispositive motions filed pursuant to this Memorandum Opinion and accompanying Order, the Court will schedule a status conference to determine the future scheduling for any further proceeding related to this matter.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.